POWERS *v.* OHIO

No. 89–5011.   Argued October 9, 1990—Decided April 1, 1991

KENNEDY, J., delivered the opinion of the Court, in which WHITE, MARSHALL, BLACKMUN, STEVENS, O'CONNOR, and SOUTER, JJ., joined. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, *post*, p. 417.

*Robert L. Lane*, by appointment of the Court, 494 U. S. 1054, argued the cause for petitioner. With him on the brief were *Randall M. Dana, Gregory L. Ayers*, and *Jill E. Stone*.

*Alan Craig Travis* argued the cause for respondent. With him on the brief was *Michael Miller*.*

---

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union et al. by *Barbara D. Underwood, Steven R. Shapiro, Julius LeVonne Chambers*, and *Charles Stephen Ralston;* and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger*.

*Harry R. Reinhart* and *Kathleen S. Aynes* filed a brief for the Ohio Association of Criminal Defense Lawyers as *amicus curiae*.

JUSTICE KENNEDY delivered the opinion of the Court.

Jury service is an exercise of responsible citizenship by all members of the community, including those who otherwise might not have the opportunity to contribute to our civic life. Congress recognized this over a century ago in the Civil Rights Act of 1875, which made it a criminal offense to exclude persons from jury service on account of their race. See 18 U. S. C. § 243. In a trilogy of cases decided soon after enactment of this prohibition, our Court confirmed the validity of the statute, as well as the broader constitutional imperative of race neutrality in jury selection. See *Strauder* v. *West Virginia*, 100 U. S. 303 (1880); *Virginia* v. *Rives*, 100 U. S. 313 (1880); *Ex parte Virginia*, 100 U. S. 339 (1880). In the many times we have confronted the issue since those cases, we have not questioned the premise that racial discrimination in the qualification or selection of jurors offends the dignity of persons and the integrity of the courts. Despite the clarity of these commands to eliminate the taint of racial discrimination in the administration of justice, allegations of bias in the jury selection process persist. In this case, petitioner alleges race discrimination in the prosecution's use of peremptory challenges. Invoking the Equal Protection Clause and federal statutory law, and relying upon well-established principles of standing, we hold that a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded jurors share the same race.

I

Petitioner Larry Joe Powers, a white man, was indicted in Franklin County, Ohio, on two counts of aggravated murder and one count of attempted aggravated murder. Each count also included a separate allegation that petitioner had a firearm while committing the offense. Powers pleaded not guilty and invoked his right to a jury trial.

In the jury selection process, Powers objected when the prosecutor exercised his first peremptory challenge to remove a black venireperson. Powers requested the trial court to compel the prosecutor to explain, on the record, his reasons for excluding a black person. The trial court denied the request and excused the juror. The State proceeded to use nine more peremptory challenges, six of which removed black venirepersons from the jury. Each time the prosecution challenged a black prospective juror, Powers renewed his objections, citing our decision in *Batson* v. *Kentucky*, 476 U. S. 79 (1986). His objections were overruled. The record does not indicate that race was somehow implicated in the crime or the trial; nor does it reveal whether any black persons sat on petitioner's petit jury or if any of the nine jurors petitioner excused by peremptory challenges were black persons.

The empaneled jury convicted Powers on counts of murder, aggravated murder, and attempted aggravated murder, each with the firearm specifications, and the trial court sentenced him to a term of imprisonment of 53 years to life. Powers appealed his conviction to the Ohio Court of Appeals, contending that the prosecutor's discriminatory use of peremptories violated the Sixth Amendment's guarantee of a fair cross section in his petit jury, the Fourteenth Amendment's Equal Protection Clause, and Article I, §§ 10 and 16, of the Ohio Constitution. Powers contended that his own race was irrelevant to the right to object to the prosecution's peremptory challenges. The Court of Appeals affirmed the conviction, and the Supreme Court of Ohio dismissed Powers' appeal on the ground that it presented no substantial constitutional question.

Petitioner sought review before us, renewing his Sixth Amendment fair cross section and Fourteenth Amendment equal protection claims. While the petition for certiorari was pending, we decided *Holland* v. *Illinois*, 493 U. S. 474 (1990). In *Holland* it was alleged the prosecution had used its peremptory challenges to exclude from the jury members

of a race other than the defendant's. We held the Sixth Amendment did not restrict the exclusion of a racial group at the peremptory challenge stage. Five members of the Court there said a defendant might be able to make the objection on equal protection grounds. See *id.*, at 488 (KENNEDY, J., concurring); *id.*, at 490 (MARSHALL, J., joined by Brennan and BLACKMUN, JJ., dissenting); *id.*, at 504 (STEVENS, J., dissenting). After our decision in *Holland*, we granted Powers' petition for certiorari limited to the question whether, based on the Equal Protection Clause, a white defendant may object to the prosecution's peremptory challenges of black venirepersons. 493 U. S. 1068 (1990). We now reverse and remand.

## II

For over a century, this Court has been unyielding in its position that a defendant is denied equal protection of the laws when tried before a jury from which members of his or her race have been excluded by the State's purposeful conduct. "The Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race, *Strauder*, [100 U. S.,] at 305, or on the false assumption that members of his race as a group are not qualified to serve as jurors, see *Norris* v. *Alabama*, 294 U. S. 587, 599 (1935); *Neal* v. *Delaware*, 103 U. S. 370, 397 (1881)." *Batson*, *supra*, at 86 (footnote omitted). Although a defendant has no right to a "petit jury composed in whole or in part of persons of [the defendant's] own race," *Strauder*, 100 U. S., at 305, he or she does have the right to be tried by a jury whose members are selected by nondiscriminatory criteria.

We confronted the use of peremptory challenges as a device to exclude jurors because of their race for the first time in *Swain* v. *Alabama*, 380 U. S. 202 (1965). *Swain* involved a challenge to the so-called struck jury system, a procedure designed to allow both the prosecution and the defense a maximum number of peremptory challenges. The venire in

noncapital cases started with about 35 potential jurors, from which the defense and the prosecution alternated with strikes until a petit panel of 12 jurors remained. The defendant in *Swain*, who was himself black, alleged that the prosecutor had used the struck jury system and its numerous peremptory challenges for the purpose of excluding black persons from his petit jury. In finding that no constitutional harm was alleged, the Court in *Swain* sought to reconcile the command of racial neutrality in jury selection with the utility, and the tradition, of peremptory challenges. The Court declined to permit an equal protection claim premised on a pattern of jury strikes in a particular case, but acknowledged that proof of systematic exclusion of black persons through the use of peremptories over a period of time might establish an equal protection violation. *Id.*, at 222–228.

We returned to the problem of a prosecutor's discriminatory use of peremptory challenges in *Batson* v. *Kentucky*. There, we considered a situation similar to the one before us today, but with one exception: Batson, the defendant who complained that black persons were being excluded from his petit jury, was himself black. During the *voir dire* examination of the venire for Batson's trial, the prosecutor used his peremptory challenges to strike all four black persons on the venire, resulting in a petit jury composed only of white persons. Batson's counsel moved without success to discharge the jury before it was empaneled on the ground that the prosecutor's removal of black venirepersons violated his rights under the Sixth and Fourteenth Amendments. Relying upon the Equal Protection Clause alone, we overruled *Swain* to the extent it foreclosed objections to the discriminatory use of peremptories in the course of a specific trial. 476 U. S., at 90–93. In *Batson* we held that a defendant can raise an equal protection challenge to the use of peremptories at his own trial by showing that the prosecutor used them for the purpose of excluding members of the defendant's race. *Id.*, at 96.

The State contends that our holding in the case now before us must be limited to the circumstances prevailing in *Batson* and that in equal protection analysis the race of the objecting defendant constitutes a relevant precondition for a *Batson* challenge. Because Powers is white, the State argues, he cannot object to the exclusion of black prospective jurors. This limitation on a defendant's right to object conforms neither with our accepted rules of standing to raise a constitutional claim nor with the substantive guarantees of the Equal Protection Clause and the policies underlying federal statutory law.

In *Batson*, we spoke of the harm caused when a defendant is tried by a tribunal from which members of his own race have been excluded. But we did not limit our discussion in *Batson* to that one aspect of the harm caused by the violation. *Batson* "was designed 'to serve multiple ends,'" only one of which was to protect individual defendants from discrimination in the selection of jurors. *Allen* v. *Hardy*, 478 U. S. 255, 259 (1986) *(per curiam)* (quoting *Brown* v. *Louisiana*, 447 U. S. 323, 329 (1980)). *Batson* recognized that a prosecutor's discriminatory use of peremptory challenges harms the excluded jurors and the community at large. 476 U. S., at 87.

The opportunity for ordinary citizens to participate in the administration of justice has long been recognized as one of the principal justifications for retaining the jury system. See *Duncan* v. *Louisiana*, 391 U. S. 145, 147–158 (1968). In *Balzac* v. *Porto Rico*, 258 U. S. 298 (1922), Chief Justice Taft wrote for the Court:

> "The jury system postulates a conscious duty of participation in the machinery of justice. . . . One of its greatest benefits is in the security it gives the people that they, as jurors actual or possible, being part of the judicial system of the country can prevent its arbitrary use or abuse." *Id.*, at 310.

And, over 150 years ago, Alexis de Tocqueville remarked:

"[T]he institution of the jury raises the people itself, or at least a class of citizens, to the bench of judicial authority [and] invests the people, or that class of citizens, with the direction of society.

.        .        .        .        .

". . . The jury . . . invests each citizen with a kind of magistracy; it makes them all feel the duties which they are bound to discharge towards society; and the part which they take in the Government.   By obliging men to turn their attention to affairs which are not exclusively their own, it rubs off that individual egotism which is the rust of society.

.        .        .        .        .

"I do not know whether the jury is useful to those who are in litigation; but I am certain it is highly beneficial to those who decide the litigation; and I look upon it as one of the most efficacious means for the education of the people which society can employ."   1 Democracy in America 334–337 (Schocken 1st ed. 1961).

Jury service preserves the democratic element of the law, as it guards the rights of the parties and ensures continued acceptance of the laws by all of the people.   See *Green* v. *United States,* 356 U. S. 165, 215 (1958) (Black, J., dissenting).   It "affords ordinary citizens a valuable opportunity to participate in a process of government, an experience fostering, one hopes, a respect for law."   *Duncan, supra,* at 187 (Harlan, J., dissenting).   Indeed, with the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process.

While States may prescribe relevant qualifications for their jurors, see *Carter* v. *Jury Comm'n of Greene County,* 396 U. S. 320, 332 (1970), a member of the community may not be excluded from jury service on account of his or her race.   See *Batson, supra,* at 84; *Swain,* 380 U. S., at 203–204; *Carter, supra,* at 329–330; *Thiel* v. *Southern Pacific Co.,* 328 U. S.

217, 220–221 (1946); *Neal* v. *Delaware*, 103 U. S. 370, 386 (1881); *Strauder*, 100 U. S., at 308. "Whether jury service be deemed a right, a privilege, or a duty, the State may no more extend it to some of its citizens and deny it to others on racial grounds than it may invidiously discriminate in the offering and withholding of the elective franchise." *Carter, supra*, at 330. Over a century ago, we recognized that:

"The very fact that [members of a particular race] are singled out and expressly denied . . . all right to partici- pate in the administration of the law, as jurors, because of their color, though they are citizens, and may be in other respects fully qualified, is practically a brand upon them, affixed by the law, an assertion of their inferior- ity, and a stimulant to that race prejudice which is an impediment to securing to individuals of the race that equal justice which the law aims to secure to all others." *Strauder, supra*, at 308.

Discrimination in the jury selection process is the subject of a federal criminal prohibition, and has been since Congress enacted the Civil Rights Act of 1875. The prohibition has been codified at 18 U. S. C. § 243, which provides:

"No citizen possessing all other qualifications which are or may be prescribed by law shall be disqualified for service as grand or petit juror in any court of the United States, or of any State on account of race, color, or pre- vious condition of servitude; and whoever, being an offi- cer or other person charged with any duty in the selec- tion or summoning of jurors, excludes or fails to summon any citizen for such cause, shall be fined not more than $5,000."

In *Peters* v. *Kiff*, 407 U. S. 493 (1972), JUSTICE WHITE spoke of "the strong statutory policy of § 243, which reflects the central concern of the Fourteenth Amendment." *Id.*, at 507 (opinion concurring in judgment). The Court permitted a white defendant to challenge the systematic exclusion of

black persons from grand and petit juries. While *Peters* did not produce a single majority opinion, six of the Justices agreed that racial discrimination in the jury selection process cannot be tolerated and that the race of the defendant has no relevance to his or her standing to raise the claim. See *id.*, at 504–505 (opinion of MARSHALL, J.); *id.*, at 506–507 (WHITE, J., concurring in judgment).

Racial discrimination in the selection of jurors in the context of an individual trial violates these same prohibitions. A State "may not draw up its jury lists pursuant to neutral procedures but then resort to discrimination at 'other stages in the selection process.'" *Batson*, 476 U. S., at 88 (quoting *Avery* v. *Georgia*, 345 U. S. 559, 562 (1953)). We so held in *Batson*, and reaffirmed that holding in *Holland*. See 493 U. S., at 479. In *Holland*, the Court held that a defendant could not rely on the Sixth Amendment to object to the exclusion of members of any distinctive group at the peremptory challenge stage. We noted that the peremptory challenge procedure has acceptance in our legal tradition. See *id.*, at 481. On this reasoning we declined to permit an objection to the peremptory challenge of a juror on racial grounds as a Sixth Amendment matter. As the *Holland* Court made explicit, however, racial exclusion of prospective jurors violates the overriding command of the Equal Protection Clause, and "race-based exclusion is no more permissible at the individual petit jury stage than at the venire stage." *Id.*, at 479.

We hold that the Equal Protection Clause prohibits a prosecutor from using the State's peremptory challenges to exclude otherwise qualified and unbiased persons from the petit jury solely by reason of their race, a practice that forecloses a significant opportunity to participate in civic life. An individual juror does not have a right to sit on any particular petit jury, but he or she does possess the right not to be excluded from one on account of race.

It is suggested that no particular stigma or dishonor results if a prosecutor uses the raw fact of skin color to determine the objectivity or qualifications of a juror. We do not believe a victim of the classification would endorse this view; the assumption that no stigma or dishonor attaches contravenes accepted equal protection principles. Race cannot be a proxy for determining juror bias or competence. "A person's race simply 'is unrelated to his fitness as a juror.'" *Batson, supra,* at 87 (quoting *Thiel* v. *Southern Pacific Co., supra,* at 227 (Frankfurter, J., dissenting)). We may not accept as a defense to racial discrimination the very stereotype the law condemns.

We reject as well the view that race-based peremptory challenges survive equal protection scrutiny because members of all races are subject to like treatment, which is to say that white jurors are subject to the same risk of peremptory challenges based on race as are all other jurors. The suggestion that racial classifications may survive when visited upon all persons is no more authoritative today than the case which advanced the theorem, *Plessy* v. *Ferguson,* 163 U. S. 537 (1896). This idea has no place in our modern equal protection jurisprudence. It is axiomatic that racial classifications do not become legitimate on the assumption that all persons suffer them in equal degree. *Loving* v. *Virginia,* 388 U. S. 1 (1967).

### III

We must consider whether a criminal defendant has standing to raise the equal protection rights of a juror excluded from service in violation of these principles. In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties. *Department of Labor* v. *Triplett,* 494 U. S. 715, 720 (1990); *Singleton* v. *Wulff,* 428 U. S. 106 (1976). This fundamental restriction on our authority admits of certain, limited exceptions. We have recognized the right of litigants to bring actions on behalf of

third parties, provided three important criteria are satisfied: The litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute, *id.*, at 112; the litigant must have a close relation to the third party, *id.*, at 113–114; and there must exist some hindrance to the third party's ability to protect his or her own interests. *Id.*, at 115–116. See also *Craig* v. *Boren*, 429 U. S. 190 (1976). These criteria have been satisfied in cases where we have permitted criminal defendants to challenge their convictions by raising the rights of third parties. See, *e. g.*, *Eisenstadt* v. *Baird*, 405 U. S. 438 (1972); *Griswold* v. *Connecticut*, 381 U. S. 479 (1965); see also *McGowan* v. *Maryland*, 366 U. S. 420 (1961). By similar reasoning, we have permitted litigants to raise third-party rights in order to prevent possible future prosecution. See, *e. g.*, *Doe* v. *Bolton*, 410 U. S. 179 (1973).

The discriminatory use of peremptory challenges by the prosecution causes a criminal defendant cognizable injury, and the defendant has a concrete interest in challenging the practice. See *Allen* v. *Hardy*, 478 U. S., at 259 (recognizing a defendant's interest in "neutral jury selection procedures"). This is not because the individual jurors dismissed by the prosecution may have been predisposed to favor the defendant; if that were true, the jurors might have been excused for cause. Rather, it is because racial discrimination in the selection of jurors "casts doubt on the integrity of the judicial process," *Rose* v. *Mitchell*, 443 U. S. 545, 556 (1979), and places the fairness of a criminal proceeding in doubt.

The jury acts as a vital check against the wrongful exercise of power by the State and its prosecutors. *Batson*, 476 U. S., at 86. The intrusion of racial discrimination into the jury selection process damages both the fact and the perception of this guarantee. "Jury selection is the primary means by which a court may enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice, *Rosales-Lopez* v. *United States*, 451 U. S. 182, 188 (1981);

*Ham* v. *South Carolina*, 409 U. S. 524 (1973); *Dennis* v. *United States*, 339 U. S. 162 (1950), or predisposition about the defendant's culpability, *Irvin* v. *Dowd*, 366 U. S. 717 (1961)." *Gomez* v. *United States*, 490 U. S. 858, 873 (1989). Active discrimination by a prosecutor during this process condones violations of the United States Constitution within the very institution entrusted with its enforcement, and so invites cynicism respecting the jury's neutrality and its obligation to adhere to the law. The cynicism may be aggravated if race is implicated in the trial, either in a direct way as with an alleged racial motivation of the defendant or a victim, or in some more subtle manner as by casting doubt upon the credibility or dignity of a witness, or even upon the standing or due regard of an attorney who appears in the cause.

Unlike the instances where a defendant seeks to object to the introduction of evidence obtained illegally from a third party, see, *e. g.*, *United States* v. *Payner*, 447 U. S. 727 (1980), here petitioner alleges that the primary constitutional violation occurred during the trial itself. A prosecutor's wrongful exclusion of a juror by a race-based peremptory challenge is a constitutional violation committed in open court at the outset of the proceedings. The overt wrong, often apparent to the entire jury panel, casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial of the cause. The *voir dire* phase of the trial represents the "jurors' first introduction to the substantive factual and legal issues in a case." *Gomez, supra,* at 874. The influence of the *voir dire* process may persist through the whole course of the trial proceedings. *Ibid.* If the defendant has no right to object to the prosecutor's improper exclusion of jurors, and if the trial court has no duty to make a prompt inquiry when the defendant shows, by adequate grounds, a likelihood of impropriety in the exercise of a challenge, there arise legitimate doubts that the jury has been chosen by proper means. The composition of the

trier of fact itself is called in question, and the irregularity may pervade all the proceedings that follow.

The purpose of the jury system is to impress upon the criminal defendant and the community as a whole that a verdict of conviction or acquittal is given in accordance with the law by persons who are fair. The verdict will not be accepted or understood in these terms if the jury is chosen by unlawful means at the outset. Upon these considerations, we find that a criminal defendant suffers a real injury when the prosecutor excludes jurors at his or her own trial on account of race.

We noted in *Singleton* that in certain circumstances "the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter." 428 U. S., at 115. Here, the relation between petitioner and the excluded jurors is as close as, if not closer than, those we have recognized to convey third-party standing in our prior cases. See, *e. g., Griswold* v. *Connecticut, supra* (Planned Parenthood official and a licensed physician can raise the constitutional rights of contraceptive users with whom they had professional relationships); *Craig, supra* (licensed beer vendor has standing to raise the equal protection claim of a male customer challenging a statutory scheme prohibiting the sale of beer to males under the age of 21 and to females under the age of 18); *Department of Labor* v. *Triplett,* 494 U. S. 715 (1990) (attorney may challenge an attorney's fees restriction by asserting the due process rights of the client). *Voir dire* permits a party to establish a relation, if not a bond of trust, with the jurors. This relation continues throughout the entire trial and may in some cases extend to the sentencing as well.

Both the excluded juror and the criminal defendant have a common interest in eliminating racial discrimination from the courtroom. A venireperson excluded from jury service because of race suffers a profound personal humiliation height-

ened by its public character.  The rejected juror may lose confidence in the court and its verdicts, as may the defendant if his or her objections cannot be heard.  This congruence of interests makes it necessary and appropriate for the defendant to raise the rights of the juror.  And, there can be no doubt that petitioner will be a motivated, effective advocate for the excluded venirepersons' rights.  Petitioner has much at stake in proving that his jury was improperly constituted due to an equal protection violation, for we have recognized that discrimination in the jury selection process may lead to the reversal of a conviction.  See *Batson*, 476 U. S., at 100; *Vasquez* v. *Hillery*, 474 U. S. 254, 264 (1986); *Rose* v. *Mitchell*, 443 U. S., at 551; *Cassell* v. *Texas*, 339 U. S. 282 (1950).  Thus, "'there seems little loss in terms of effective advocacy from allowing [the assertion of this claim] by' the present *jus tertii* champion." *Craig*, 429 U. S., at 194 (quoting *Singleton, supra*, at 118).

The final inquiry in our third-party standing analysis involves the likelihood and ability of the third parties, the excluded venirepersons, to assert their own rights.  See *Singleton, supra*, at 115–116.  We have held that individual jurors subjected to racial exclusion have the legal right to bring suit on their own behalf. *Carter*, 396 U. S., at 329–330.  As a practical matter, however, these challenges are rare.  See Alschuler, The Supreme Court and the Jury: Voir Dire, Peremptory Challenges, and the Review of Jury Verdicts, 56 U. Chi. L. Rev. 153, 193–195 (1989).  Indeed, it took nearly a century after the Fourteenth Amendment and the Civil Rights Act of 1875 came into being for the first such case to reach this Court.  See *Carter, supra*, at 320.

The barriers to a suit by an excluded juror are daunting. Potential jurors are not parties to the jury selection process and have no opportunity to be heard at the time of their exclusion.  Nor can excluded jurors easily obtain declaratory or injunctive relief when discrimination occurs through an individual prosecutor's exercise of peremptory challenges.

Unlike a challenge to systematic practices of the jury clerk and commissioners such as we considered in *Carter*, it would be difficult for an individual juror to show a likelihood that discrimination against him at the *voir dire* stage will recur. See *Los Angeles* v. *Lyons*, 461 U. S. 95, 105–110 (1983). And, there exist considerable practical barriers to suit by the excluded juror because of the small financial stake involved and the economic burdens of litigation. See *Vasquez, supra,* at 262, n. 5; *Rose* v. *Mitchell, supra,* at 558. The reality is that a juror dismissed because of race probably will leave the courtroom possessing little incentive to set in motion the arduous process needed to vindicate his own rights. See *Barrows* v. *Jackson*, 346 U. S. 249, 257 (1953).

We conclude that a defendant in a criminal case can raise the third-party equal protection claims of jurors excluded by the prosecution because of their race. In so doing, we once again decline "to reverse a course of decisions of long standing directed against racial discrimination in the administration of justice." *Cassell* v. *Texas, supra,* at 290 (Frankfurter, J., concurring in judgment). To bar petitioner's claim because his race differs from that of the excluded jurors would be to condone the arbitrary exclusion of citizens from the duty, honor, and privilege of jury service. In *Holland* and *Batson*, we spoke of the significant role peremptory challenges play in our trial procedures, but we noted also that the utility of the peremptory challenge system must be accommodated to the command of racial neutrality. *Holland*, 493 U. S., at 486–487; *Batson, supra,* at 98–99.

The Fourteenth Amendment's mandate that race discrimination be eliminated from all official acts and proceedings of the State is most compelling in the judicial system. *Rose* v. *Mitchell, supra,* at 555. We have held, for example, that prosecutorial discretion cannot be exercised on the basis of race, *Wayte* v. *United States*, 470 U. S. 598, 608 (1985), and that, where racial bias is likely to influence a jury, an inquiry must be made into such bias. *Ristaino* v. *Ross*, 424 U. S.

589, 596 (1976); see also *Turner* v. *Murray*, 476 U. S. 28 (1986). The statutory prohibition on discrimination in the selection of jurors, 18 U. S. C. § 243, enacted pursuant to the Fourteenth Amendment's Enabling Clause, makes race neutrality in jury selection a visible, and inevitable, measure of the judicial system's own commitment to the commands of the Constitution. The courts are under an affirmative duty to enforce the strong statutory and constitutional policies embodied in that prohibition. See *Peters* v. *Kiff*, 407 U. S., at 507 (WHITE, J., concurring in judgment); see also *id.*, at 505 (opinion of MARSHALL, J.).

The emphasis in *Batson* on racial identity between the defendant and the excused prospective juror is not inconsistent with our holding today that race is irrelevant to a defendant's standing to object to the discriminatory use of peremptory challenges. Racial identity between the defendant and the excused person might in some cases be the explanation for the prosecution's adoption of the forbidden stereotype, and if the alleged race bias takes this form, it may provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred. But to say that the race of the defendant may be relevant to discerning bias in some cases does not mean that it will be a factor in others, for race prejudice stems from various causes and may manifest itself in different forms.

It remains for the trial courts to develop rules, without unnecessary disruption of the jury selection process, to permit legitimate and well-founded objections to the use of peremptory challenges as a mask for race prejudice. In this case, the State concedes that, if we find the petitioner has standing to object to the prosecution's use of the peremptory challenges, the case should be remanded. We find that petitioner does have standing. The judgment is reversed, and the case is remanded for further proceedings not inconsistent with our opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom THE CHIEF JUSTICE joins, dissenting.

Since in my view today's decision contradicts well-established law in the area of equal protection and of standing, I respectfully dissent.

## I

The Court portrays its holding as merely the logical application of our prior jurisprudence concerning equal protection challenges to criminal convictions. It is far from that.

Over a century ago, in *Strauder* v. *West Virginia*, 100 U. S. 303 (1880), we held that a statute barring blacks from service on grand or petit juries denied equal protection of the laws to a black man convicted of murder by an all-white jury. Interpreting the recently enacted Fourteenth Amendment, we concluded that the statute violated the black defendant's equal protection right for the following reason:

> "It is not easy to comprehend how it can be said that while every white man is entitled to a trial by a jury selected from persons of his own race or color, or, rather, selected without discrimination against his color, and a negro is not, the latter is equally protected by the law with the former. Is not protection of life and liberty against race or color prejudice, a right, a legal right, under the constitutional amendment? And how can it be maintained that compelling a colored man to submit to a trial for his life by a jury drawn from a panel from which the State has expressly excluded every man of his race, because of color alone, however well qualified in other respects, is not a denial to him of equal legal protection?" *Id.*, at 309.

It was not suggested in *Strauder*, and I am sure it was quite unthinkable, that a *white* defendant could have had his conviction reversed on the basis of the same statute. The statute did not exclude members of *his* race, and thus did not deprive *him* of the equal protection of the laws.

Since *Strauder*, we have repeatedly invalidated criminal convictions on equal protection grounds where state laws or practices excluded potential jurors from service on the basis of race. See *Vasquez* v. *Hillery*, 474 U. S. 254 (1986); *Castaneda* v. *Partida*, 430 U. S. 482 (1977); *Alexander* v. *Louisiana*, 405 U. S. 625 (1972); *Sims* v. *Georgia*, 389 U. S. 404 (1967) *(per curiam); Jones* v. *Georgia*, 389 U. S. 24 (1967) *(per curiam); Whitus* v. *Georgia*, 385 U. S. 545 (1967); *Coleman* v. *Alabama*, 377 U. S. 129 (1964); *Arnold* v. *North Carolina*, 376 U. S. 773 (1964) *(per curiam); Eubanks* v. *Louisiana*, 356 U. S. 584 (1958); *Reece* v. *Georgia*, 350 U. S. 85 (1955); *Williams* v. *Georgia*, 349 U. S. 375 (1955); *Hernandez* v. *Texas*, 347 U. S. 475 (1954); *Avery* v. *Georgia*, 345 U. S. 559 (1953); *Cassell* v. *Texas*, 339 U. S. 282 (1950); *Patton* v. *Mississippi*, 332 U. S. 463 (1947); *Hill* v. *Texas*, 316 U. S. 400 (1942); *Smith* v. *Texas*, 311 U. S. 128 (1940); *Pierre* v. *Louisiana*, 306 U. S. 354 (1939); *Hale* v. *Kentucky*, 303 U. S. 613 (1938) *(per curiam); Hollins* v. *Oklahoma*, 295 U. S. 394 (1935) *(per curiam); Norris* v. *Alabama*, 294 U. S. 587 (1935); *Rogers* v. *Alabama*, 192 U. S. 226 (1904); *Carter* v. *Texas*, 177 U. S. 442 (1900); *Bush* v. *Kentucky*, 107 U. S. 110 (1883); *Neal* v. *Delaware*, 103 U. S. 370 (1881). In *all* these cases, the basis for our decision was that the State had violated the *defendant*'s right to equal protection, because it had excluded jurors of *his* race. As we said in *Carter* v. *Texas:* "Whenever by any action of a State, whether through its legislature, through its courts, or through its executive or administrative officers, all persons of the African race are excluded, solely because of their race or color, from serving as grand jurors in the criminal prosecution of a person of the African race, the equal protection of the laws is denied *to him*, contrary to the Fourteenth Amendment of the Constitution of the United States." 177 U. S., at 447 (emphasis added).

Twenty-six years ago, in *Swain* v. *Alabama*, 380 U. S. 202 (1965), we first considered an equal protection claim against peremptory challenges by the prosecution. In that case, a

black man had been convicted and sentenced to death by an all-white jury, the prosecutor having peremptorily struck six prospective black jurors from the venire. We rejected the defendant's equal protection claim. Our opinion set forth at length the "very old credentials" of the peremptory challenge, *id.*, at 212, see *id.*, at 212–219, discussed the reasons for the "long and widely held belief" that it is "a necessary part of trial by jury," *id.*, at 219, see *id.*, at 219–221, and observed that it is "frequently exercised on grounds normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliations of people summoned for jury duty," *id.*, at 220. To accept petitioner's equal protection claim, we said, "would establish a rule wholly at odds with the peremptory challenge system as we know it," *id.*, at 222, a system in which "Negro and white, Protestant and Catholic, are alike subject to being challenged without cause," *id.*, at 221. But while permitting race-based challenges for the traditional purpose of eliminating "irrational . . . suspicions and antagonisms," *id.*, at 224, "related to the case [the prosecutor] is trying, the particular defendant involved and the particular crime charged," *id.*, at 223, we strongly suggested that it would violate the Equal Protection Clause to use race-based challenges as a surrogate for segregated jury lists, employing them "in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim," *ibid.*, in order to "deny the Negro the same right and opportunity to participate in the administration of justice enjoyed by the white population," *id.*, at 224.

Five years ago we revisited the issue, and overruled *Swain*. In *Batson* v. *Kentucky*, 476 U. S. 79 (1986), we held that "a defendant may make a prima facie showing of purposeful racial discrimination in selection of the venire by relying solely on the facts concerning its selection *in his case*," *id.*, at 95 (emphasis in original), whereupon the prosecution would be required to justify its strikes on race-neutral

grounds. *Batson*, however, like all our other cases upholding an equal protection challenge to the composition of criminal juries, referred to—indeed, it *emphasized*—the necessity of racial identity between the defendant and the excluded jurors. "[T]he defendant," we said, "first must show that *he is a member of a cognizable racial group*, and that the prosecutor has exercised peremptory challenges to remove from the venire *members of the defendant's race*." *Id.*, at 96 (emphasis added; citation omitted). This requirement was repeated several times. "The defendant initially must show that *he* is a member of a racial group capable of being singled out for differential treatment." *Id.*, at 94 (emphasis added). "The Equal Protection Clause guarantees the defendant that the State will not exclude members of *his race* from the jury venire on account of race." *Id.*, at 86 (emphasis added). JUSTICE WHITE, concurring, concluded that the abandonment of *Swain* was justified because "[i]t appears . . . that the practice of peremptorily eliminating blacks from petit juries *in cases with black defendants* remains widespread, so much so that I agree that an opportunity to inquire should be afforded when this occurs." *Id.*, at 101 (emphasis added). Today's opinion for the Court is correct in noting that *Batson* asserted that "a prosecutor's discriminatory use of peremptory challenges harms the excluded jurors and the community at large," *ante*, at 406. But there is no contradiction, and *Batson* obviously saw none, between that proposition and the longstanding and reiterated principle that no defendant except one *of the same race as the excluded juror* is deprived of equal protection of the laws.

On only two occasions in the past have we considered claims by a criminal defendant of one race that the prosecution had discriminated against prospective jurors of another race. Last Term, in *Holland* v. *Illinois*, 493 U. S. 474 (1990), we held that the prosecution's use of peremptory strikes against black jurors did not deprive a white defendant of his Sixth Amendment right to an impartial jury. No

equal protection claim was made in that case. Such a claim was made, however, in *Peters* v. *Kiff*, 407 U. S. 493 (1972). There the petitioner, a white man, contended that the State, through its use of segregated jury lists, had excluded blacks from his grand and petit juries, thus denying him due process and equal protection. The case produced no majority opinion, but it is significant that *no Justice* relied upon the petitioner's equal protection argument. JUSTICE MARSHALL, joined by Justice Douglas and Justice Stewart, asserted that a defendant has a due process right not to be subjected "to indictment or trial by a jury that has been selected in an arbitrary and discriminatory manner." *Id.*, at 502. JUSTICE WHITE, joined by Justice Brennan and Justice Powell, concluded that "the strong statutory policy" contained in the 1875 criminal statute prohibiting disqualification from jury service on racial grounds, 18 U. S. C. § 243, entitled the petitioner to challenge the exclusion of blacks from the grand jury that indicted him. 407 U. S., at 507. Chief Justice Burger, joined by JUSTICE BLACKMUN and then-JUSTICE REHNQUIST, contended that there was no basis for assuming that the petitioner had been injured in any way by the alleged discrimination, and noted that "the Court has never intimated that a defendant is the victim of unconstitutional discrimination if he does not claim that members of his own race have been excluded." *Id.*, at 509.

*Alexander* v. *Louisiana*, 405 U. S. 625 (1972), involved precisely the sort of claim made here, in the context of an alleged denial of equal protection on the basis of sex. In that case, a black male defendant contended that the State's manner of composing its jury lists had excluded blacks and women from his grand jury, thereby denying him equal protection of the laws. We ultimately found it unnecessary to reach his claim regarding the exclusion of women, but only after saying the following:

> "This claim is novel in this Court and, when urged by a male, finds no support in our past cases. The strong

constitutional and statutory policy against racial dis-
crimination has permitted Negro defendants in criminal
cases to challenge the systematic exclusion of Negroes
from the grand juries that indicted them. . . . [T]here is
nothing in past adjudications suggesting that petitioner
*himself* has been denied equal protection by the alleged
exclusion of women from grand jury service." *Id.*, at
633 (emphasis added).

Similarly, in *Castaneda* v. *Partida*, 430 U. S. 482 (1977), in
holding that the respondent had successfully established a
prima facie case of discrimination against Mexican-Americans
in the selection of grand jurors, we said that "in order to
show that an equal protection violation has occurred in the
context of grand jury selection, the defendant must show
that the procedure employed resulted in substantial under-
representation of *his race or of the identifiable group to
which he belongs.*" *Id.*, at 494 (emphasis added).

Thus, both before and after *Batson,* and right down to the
release of today's opinion, our jurisprudence contained nei-
ther a case holding, nor even a dictum suggesting, that a de-
fendant could raise an equal protection challenge based upon
the exclusion of a juror of another race; and our opinions con-
tained a vast body of clear statement to the contrary. We
had reaffirmed the point just last Term in *Holland, supra.*
After quoting the language from *Batson* requiring the de-
fendant to show that he is a member of the racial group
alleged to have been removed from the jury, we contrasted
the requirements for standing under the Fourteenth Amend-
ment's Equal Protection Clause and the Sixth Amendment:
"We have never suggested, however, that such a *require-
ment of correlation* between the group identification of the
defendant and the group identification of excluded venire
members is necessary for Sixth Amendment standing. *To
the contrary,* our cases hold that the Sixth Amendment enti-
tles every defendant to object to a venire that is not designed
to represent a fair cross section of the community, whether

or not the systematically excluded groups are groups to which he himself belongs." 493 U. S., at 477 (emphasis added).

Thus, today's holding cannot be considered in accordance with our prior law. It is a clear departure.

## II

In an apparent attempt to portray the question before us as a novel one, the Court devotes a large portion of its opinion to third-party standing—as though that obvious avenue of rendering the Equal Protection Clause applicable had not occurred to us in the many cases discussed above. Granted, the argument goes, that this white defendant has not *himself* been denied equal protection, but he has third-party standing to challenge the denial of equal protection to the stricken black jurors. The Court's discussion of third-party standing is no more faithful to our precedent than its description of our earlier equal protection cases. Before reaching that point, however, there is a prior one: The *first-party* right upon which the Court seeks to *base* third-party standing has not hitherto been held to exist.

All citizens have the equal protection right not to be excluded from *jury service* (*i. e.*, not to be excluded from grand- and petit-jury lists) on the basis of irrelevant factors such as race, *Carter* v. *Jury Comm'n of Greene County*, 396 U. S. 320 (1970), or employment status, cf. *Thiel* v. *Southern Pacific Co.*, 328 U. S. 217 (1946). As *Swain* suggested, this principle would also prohibit the systematic exclusion of a particular race or occupation from all jury service through peremptory challenges. When a particular group has been singled out in this fashion, its members have been treated *differently*, and have suffered the deprivation of a right and responsibility of citizenship. But when that group, *like all others*, has been made subject to peremptory challenge on the basis of its group characteristic, its members have been treated not differently but the same. In fact, it would con-

stitute discrimination to *exempt* them from the peremptory-strike exposure to which all others are subject. If, for example, men were permitted to be struck but not women, or fundamentalists but not atheists, or blacks but not whites, members of the former groups would plainly be the object of discrimination.

In reply to this, it could be argued that discrimination is not legitimated by being applied, so to speak, indiscriminately; that the unlawfulness of treating one person differently on irrelevant grounds is not erased by subjecting everyone else to the same unlawfulness. The response to this is that the stricken juror has *not* been "treated differently" in the only pertinent sense—that is, in the sense of being deprived of any benefit or subjected to any slight or obloquy. The strike does not deprecate his group, and thereby "stigmatize" his own personality. Unlike the categorical exclusion of a group from jury service, which implies that all its members are incompetent or untrustworthy, a peremptory strike on the basis of group membership implies nothing more than the undeniable reality (upon which the peremptory strike system is largely based) that all groups tend to have particular sympathies and hostilities—most notably, sympathies towards their own group members. Since that reality is acknowledged as to *all* groups, and forms the basis for peremptory strikes as to *all* of them, there is no implied criticism or dishonor to a strike. Nor is the juror who is struck because of his group membership deprived of any benefit. It is obvious, as *Strauder* acknowledged, that a defendant belonging to an identifiable group is benefited by having members of that group on his jury, but it is impossible to understand how a juror is benefited by sitting in judgment of a member of his own group, rather than of another. All qualified citizens have a civic right, of course, to serve as jurors, but none has the right to serve as a juror in a particular case. Otherwise, we would have to permit stricken jurors to complain not only of peremptory challenges that supposedly deny

them equal protection, but also of erroneously allowed challenges for cause.

To affirm that the Equal Protection Clause applies to strikes of individual jurors is effectively to abolish the peremptory challenge. As discussed in *Swain*, "irrelevant" personal characteristics are by definition the basis for using that device; *relevant* characteristics would produce recusal *for cause*. And as *Swain* also pointed out, the irrelevant characteristics relied upon are frequently those that would promptly trigger invalidation in other contexts—not only race, but religion, sex, age, political views, economic status. Not only is it implausible that such a permanent and universal feature of our jury-trial system is unconstitutional, but it is unlikely that its elimination would be desirable. The peremptory challenge system has endured so long because it has unquestionable advantages. As we described in *Holland*, 493 U. S., at 484, it is a means of winnowing out possible (though not demonstrable) sympathies and antagonisms on both sides, to the end that the jury will be the fairest possible. In a criminal-law system in which a single biased juror can prevent a deserved conviction or a deserved acquittal, the importance of this device should not be minimized.

Until *Batson*, our jurisprudence affirmed the categorical validity of peremptory strikes so long as they were not used as a substitute for segregated jury lists. *Batson* made an exception, but one that was narrow in principle and hence limited in effect. It announced an equal protection right, not of prospective jurors to be seated without regard to their race, but *of defendants* not to be tried by juries from which members of *their* race have been intentionally excluded. While the opinion refers to "[t]he harm" that "discriminatory jury selection" inflicts upon "the excluded juror," 476 U. S., at 87, that is not a clear recognition, even in dictum, that the excluded juror has his own cause of action—any more than its accompanying reference to the harm inflicted upon "the entire community," *ibid.*, suggests that the entire community

has a cause of action. To the contrary, an independent cause of action on the juror's part is quite incompatible with the opinion's repeated insistence that the stricken juror must be *of the same race* as the defendant. It would be absurd to suppose that a black juror has a right not to be discriminated against, through peremptory strike, in the trial of a black defendant, but not in the trial of a white defendant.

In sum, we have *never* held, or even said, that a juror has an equal protection right not to be excluded from a particular case through peremptory challenge; and the existence of such a right would call into question the continuing existence of a centuries-old system that has important beneficial effects. Thus, even if the Court's discussion of Powers' third-party standing to raise the rights of stricken jurors were correct, it would merely replace the mystery of why *he* has a cause of action with the mystery of why *they* do.

## III

In any event, the Court's third-party standing analysis is not correct. The Court fails to establish what we have described as the very first element of third-party standing: the requirement of "injury in fact." See, *e. g., Caplin & Drysdale, Chartered* v. *United States*, 491 U. S. 617, 623, n. 3 (1989); *Secretary of State of Maryland* v. *Joseph H. Munson Co.*, 467 U. S. 947, 954–955 (1984). The Court's attempt at constructing an injury in fact to petitioner goes as follows: When the prosecution takes race into account in exercising its peremptory challenges, it "casts doubt on the integrity of the judicial process," and "invites cynicism respecting the jury's neutrality and its obligation to adhere to the law," *ante*, at 411, 412 (internal quotations omitted), as a result of which "[t]he verdict will not be accepted or understood [as fair]," *ante*, at 413. The Court must, of course, speak in terms of the *perception* of fairness rather than its reality, since only last Term we held categorically that the exclusion of members of a particular race from a jury does *not* produce

an unfair jury, and suggested that in some circumstances it may increase fairness. See *Holland, supra,* at 480–481. But in any event, how do these alleged perceptions of unfairness, these "castings of doubt" and "invitations to cynicism," establish that the defendant has been injured *in fact?* They plainly do not. Every criminal defendant objecting to the introduction of some piece of evidence or to some trial procedure on the ground that it violates the rights of a third party can claim a similar "perception of unfairness," but we deny standing. "Injury in perception" would seem to be the very *antithesis* of "injury in fact." As the very words suggest, the latter sort of injury must be "distinct *and palpable,"* *Warth* v. *Seldin,* 422 U. S. 490, 501 (1975) (emphasis added), "particular *[and]* `concrete," *United States* v. *Richardson,* 418 U. S. 166, 177 (1974) (emphasis added), "specific *[and] objective," Laird* v. *Tatum,* 408 U. S. 1, 14 (1972) (emphasis added). Today's opinion makes a mockery of that requirement. It does not even pretend that the peremptory challenges here have caused this defendant tangible injury and concrete harm—but rather (with careful selection of both adjectives and nouns) only a *"cognizable* injury," producing a "concrete *interest* in challenging the practice." *Ante,* at 411 (emphasis added). I have no doubt he now has a cognizable injury; the Court has made it true by saying so. And I have no doubt he has a concrete interest in challenging the practice at issue here; he would have a concrete interest in challenging a mispronunciation of one of the jurors' names, if that would overturn his conviction. But none of this has anything to do with injury in fact.

In response, however, it could be asserted that the requirement of injury in fact—and, more specifically, that element of the requirement which demands that the cause-and-effect relationship between the illegality and the alleged harm be *more than speculative,* see *Allen* v. *Wright,* 468 U. S. 737, 750–752 (1984); *Simon* v. *Eastern Kentucky Welfare Rights Organization,* 426 U. S. 26, 40–46 (1976)—has

never been applied to a litigant's claim of illegality relating to an aspect of criminal or civil procedure. The available concrete injury in such cases, of course, is the conviction or judgment—or more precisely, the punishment that attends the conviction and the economic or other loss that attends the judgment. But courts have never required that injury to be connected with the alleged procedure-related illegality by anything more than speculation. If, for example, one of the elements of criminal due process has been denied, or one of the constitutionally specified attributes of a prosecution has been omitted, we do not require the defendant to establish, by more than speculation, that he would not otherwise have been convicted. To the contrary, standing is accorded, and relief will be granted unless the government can establish beyond a reasonable doubt that the error was harmless. See, *e. g.*, *Rose* v. *Clark*, 478 U. S. 570 (1986).

We do not, however, extend this special treatment of injury in fact in the litigation context to third-party standing. Indeed, we do not even *recognize* third-party standing in the litigation context—that is, permit a civil or criminal litigant to upset an adverse judgment because the process by which it was obtained involved the violation of someone else's rights—even when the *normal* injury-in-fact standard is amply met. If, for example, the *only* evidence supporting a conviction (so that the causality is not remotely speculative) consists of the fruit of a search and seizure that violated a third party's Fourth Amendment rights, we will not permit those rights to be asserted by the defendant. See, *e. g.*, *Rawlings* v. *Kentucky*, 448 U. S. 98 (1980); *United States* v. *Payner*, 447 U. S. 727 (1980); *Rakas* v. *Illinois*, 439 U. S. 128 (1978). We would reach the same result with respect to reliable evidence obtained in violation of another person's Fifth Amendment right against self-incrimination, cf. *id.*, at 140, n. 8. Likewise (assuming we follow the common law) with respect to evidence introduced in violation of someone else's confidentiality privilege. See, *e. g.*, *Commonwealth* v. *McKenna*,

206 Pa. 317, 322, 213 A. 2d 223, 226 (1965); *Butz v. State*, 221 Md. 68, 73, 156 A. 2d 423, 426 (1959); see generally Annot., 2 A. L. R. 2d 645 (1948). These cases can, to be sure, be explained on the basis that the rights in question are "personal," rather than on the basis of lack of third-party standing, but the result comes to the same. It is difficult to accept the proposition that, even though introduction of the fruits of a third party's illegally obtained confession, which unquestionably produces the defendant's conviction, is not a ground for reversal, racial discrimination against a prospective juror, which only speculatively produces the conviction, is. There is, in short, no sound basis for abandoning the normal injury-in-fact requirements applicable to third-party standing, and supplanting them with an "interest in challenging the practice" standard, simply because a trial-related violation is at issue. If anything, that consideration should lead to the conclusion that there is no third-party standing at all.

## IV

Last Term, in *Holland*, we noted that "[t]he tradition of peremptory challenges for both the prosecution and the accused was already venerable at the time of Blackstone, . . . was reflected in a federal statute enacted by the same Congress that proposed the Bill of Rights, . . . was recognized in an opinion by Justice Story to be part of the common law of the United States, . . . and has endured through two centuries in all the States. . . ." 493 U. S., at 481. We concluded from this that "[a]ny theory of the Sixth Amendment leading to [the] result" that "each side may not . . . use peremptory challenges to eliminate prospective jurors belonging to groups it believes would unduly favor the other side" is "implausible." *Ibid.* What is true with respect to the Sixth Amendment is true with respect to the Equal Protection Clause as well.

*Batson* was, as noted earlier, a clear departure from our jurisprudence, and the precise scope of the exception it has

created remains to be determined. It is unclear, for example, whether it applies to government peremptories in civil cases; whether it applies to peremptories by parties other than the government; and whether it applies to peremptories based on the defendant's sex, religion, age, economic status and *any other* personal characteristic unrelated to the capacity for responsible jury service. All these extensions are arguably within the logic of the decision. This case, however, involves not a clarification of *Batson*, but the creation of an additional, *ultra-Batson* departure from established law. Petitioner seeks not some further elaboration of the right to have his racial identity disregarded in the selection of his jury, but rather the announcement of a new right to have his jury immune from the exclusion of people of *any* race; or the announcement of a new power to assert a new right of jurors never to be excluded from any jury on the basis of their race. Not only does this exceed the rationale of *Batson*, but it exceeds *Batson*'s emotional and symbolic justification as well. Notwithstanding history, precedent, and the significant benefits of the peremptory-challenge system, it is intolerably offensive for the State to imprison a person on the basis of a conviction rendered by a jury from which members of that person's minority race were carefully excluded. I am unmoved, however, and I think most Americans would be, by this white defendant's complaint that he was sought to be tried by an all-white jury, or that he should be permitted to press black jurors' unlodged complaint that they were not allowed to sit in judgment of him.

The Court's decision today is unprecedented in law, but not in approach. It is a reprise, so to speak, of *Miranda* v. *Arizona*, 384 U. S. 436 (1966), in that the Court uses its key to the jailhouse door not to free the arguably innocent, but to threaten release upon the society of the unquestionably guilty unless law enforcement officers take certain steps that the Court newly announces to be required by law. It goes beyond *Miranda*, however, in that there, at least, the man-

dated steps related to the defendant's own rights, if not to his guilt. Here they relate to neither. The sum and substance of the Court's lengthy analysis is that, since a denial of equal protection to other people occurred at the defendant's trial, though it did not affect the fairness of that trial, the defendant must go free. Even if I agreed that the exercise of peremptory strikes constitutes unlawful discrimination (which I do not), I would not understand why the release of a convicted murderer who has not been harmed by those strikes is an appropriate remedy.

Judging from the Court's opinion, we can expect further, wide-ranging use of the jailhouse key to combat discrimination. Convictions are to be overturned, apparently, *whenever* "race is implicated in the trial"—"by casting doubt upon the credibility or dignity of a witness, or . . . upon the standing or due regard of an attorney who appears in the cause," or even by suggesting "an alleged racial motivation of the defendant or a victim." *Ante*, at 412. To me this makes no sense. Lofty aims do not justify every step intended to achieve them. Today's supposed blow against racism, while enormously self-satisfying, is unmeasured and misdirected. If for any reason the State is unable to reconvict Powers for the double murder at issue here, later victims may pay the price for our extravagance. Even if such a tragedy, in this or any case, never occurs, the prosecutorial efforts devoted to retrials will necessarily be withheld from other endeavors, as will the prosecutorial efforts devoted to meeting the innumerable *Powers* claims that defendants of all races can be relied upon to present—again with the result that crime goes unpunished and criminals go free.

I respectfully dissent.