The appellant, Robert Earl Council, was convicted of murder made capital because the murder was committed during the course of a robbery, see § 13A-5-40(a)(2), Code of Alabama 1975. The jury, by a vote of 11 to 1, recommended a sentence of life imprisonment without the possibility of parole. The trial court accepted the jury's recommendation and sentenced the appellant to life in the state penitentiary.
The state's evidence tended to show that on July 17, 1994, police discovered the body of Ronald Talmadge Henderson propped behind the steering wheel of his car on the corner of Griswold Road and Fleming Street in Enterprise, Alabama. The victim had been shot twice in the head. Dr. Alfredo Paredes, a forensic pathologist, testified that Henderson died as a result of two gunshot wounds to the head, one of which entered his face next to his mouth and the other of which entered behind the right ear, went through the skull and damaged the brain. *Page 497 
The evidence tended to show further that on July 16, 1994, Ronald Talmadge Henderson purchased a Chinese-made SKS assault rifle from a pawnshop in Enterprise. Marcus Neal testified that the day after he had purchased the rifle, Henderson tried to sell the rifle at Venus Flowers's house. Flowers made several telephone calls to people who she thought might be interested in purchasing the rifle. One of the people she called was the appellant who was at a party at his brother's house when he received Flowers's call. The appellant left the party with Marcus Neal, Larry Brooks, and Willie Adams, and went to Flowers's house. Neal testified that the appellant said that he was going "to buy this gun from this white guy." Dale Green, Venus Flowers, and Henderson were at Flowers's house. When Henderson started loading and unloading the rifle, Flowers asked them to leave. Neal testified that the appellant had a revolver in his pocket at this time. The group then left Flowers's house and went to Dale Green's house, located one block from Flowers's house. Before entering Green's house, Henderson shot the rifle into the ground to demonstrate the weapon. While Henderson was fumbling with the gun, the appellant told Willie Adams to grab the rifle because Henderson appeared to be intoxicated. Adams took the rifle and ran. The appellant, Willie Adams, Marcus Neal, and Antonio Frazier jumped into Larry Brooks's automobile, a yellow Cadillac, which was parked across the street. The appellant was sitting in the rear passenger seat. After they had traveled several blocks, Henderson blocked the car with his car and ran the car off the road. Neal ducked and the appellant said, "M______ F_____, you trying to block me." Neal testified that he then heard gunshots and looked up and saw that the appellant's forearm was out of the window. He turned around and saw Henderson's car run into a fence.
Darryl Clark testified that he witnessed the shooting and that he saw shots fired from the back seat of a yellow Cadillac.
Tyra Grimsley testified that the appellant came to her apartment the day after the shooting and confessed that he had shot and killed Henderson and that Willie Adams had been arrested for capital murder. Stewart Dean Ebbinga testified that he shared a cell with the appellant at the Coffee County jail. Ebbinga said that he and the appellant where talking one day and he asked the appellant why he shot that man, and the appellant said, "For the rush of it. For the thrill. Because I had to. He burned me."
 I
The appellant initially contends that there was not sufficient evidence to convict him of murder committed during the course of a robbery.
 "When considering a sufficiency issue, a reviewing court views the evidence in the light most favorable to the state. Colvette v. State, 568 So.2d 319 (Ala.Cr.App. 1990). Further, 'it is not the province of [the Court of Criminal Appeals] to reweigh the evidence presented at trial.' Watkins v. State, 565 So.2d 1227, 1231 (Ala.Cr.App. 1990)."
Saffold v. State, 627 So.2d 1107, 1109 (Ala.Cr.App. 1993). See also A.B.T. v. State, 620 So.2d 120 (Ala.Cr.App. 1992); O'Neilv. State, 605 So.2d 1247 (Ala.Cr.App. 1992).
There was more than sufficient evidence presented to submit the case to the jury for its determination.
 II
The appellant further contends that the state violated the United States Supreme Court's holding in Batson v. Kentucky,476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), by using its peremptory strikes in a racially discriminatory manner.
The United States Supreme Court in Batson held that black veniremembers could not be struck from a black defendant's jury based solely on their race. 476 U.S. at 89, 106 S.Ct. at 1719. In Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364,113 L.Ed.2d 411 (1991), the Court extended its decision in Batson to white defendants, to civil litigants in Edmonson v. LeesvilleConcrete Co., 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660
(1991), and to defense counsel in criminal trials in Georgia v.McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992). The *Page 498 
Alabama Supreme Court in White Consolidated Industries, Inc. v.American Liberty Insurance Co., 617 So.2d 657 (Ala. 1993), held that Batson applies to the striking of white prospective jurors. In 1994, the United States Supreme Court extendedBatson to apply to gender-based strikes in J.E.B. v. Alabama,511 U.S. 127, 114 S.Ct. 1419, 128 L.E.2d 89 (1994). Batson has also been applied to the striking of Asians from the venire.Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859,114 L.Ed.2d 395 (1991). See also Wilsher v. State, 611 So.2d 1175,1184 (Ala.Cr.App. 1992).
The appellant contends that the state used its peremptory strikes to remove all the blacks from the venire. The record reflects that after strikes for cause were granted only 16 minority prospective jurors remained on the venire — 15 blacks and 1 Asian. The state used seven strikes to remove minority prospective jurors. The court found a prima facie case ofBatson had been established and asked the prosecution to give its reasons for striking the prospective jurors.
The state said that it struck prospective juror number 140 because she stated that she preferred not to serve, because she stated that she was against the death penalty, and because she was related to a defense witness. Prospective juror number 64 was struck because she was opposed to the death penalty, she was related to a defense witness, and she lived with a man who was charged with the attempted murder of a police officer. Juror number 191 was struck because he had previously been a jailer with the Coffee County Sheriff's Department and had been fired because of criminal misconduct related to his duties as jailer. Juror number 151, an Asian female, was struck because she stated that she did not want to serve on the jury. Juror number 56 was struck because her son had been prosecuted by the district attorney's office and she was opposed to the death penalty. Juror number 75 was struck because she had gone to high school with the appellant and because her mother had been prosecuted for writing worthless checks. Juror number 20 was struck because she knew defense witnesses and because she lived with a deputy sheriff.
The court erroneously found that the reasons for striking prospective juror 75 were not race-neutral and placed that juror back on the venire.
The United States Supreme Court recently in Purkett v. Elem, ___ U.S. ___, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), stated the following about evaluating the reasons given for striking prospective jurors:
 "The Court of Appeals appears to have seized on our admonition in Batson that to rebut a prima facie case, the proponent of a strike 'must give a "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges,' Batson, 476 U.S., at 98, n. 20, 106 S.Ct., at 1724, n. 20 (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981)), and that the reason must be 'related to the particular case to be tried,' 476 U.S., at 98, 106 S.Ct., at 1724. See 25 F.3d [679] at 682, 683. This warning was meant to refute the notion that a prosecutor could satisfy his burden of production by merely denying that he had a discriminatory motive or by merely affirming his good faith. What it means by a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection. See Hernandez [v. New York, 500 U.S. 352] at 359, [111 S.Ct. 1859] at 1866, [114 L.Ed.2d 395 (1991)]; cf. Burdine, supra, at 255, 101 S.Ct., at 1094 ('The explanation provided must be legally sufficient to justify a judgment for the defendant')."
(Emphasis added.)
All of the reasons given in this case were race-neutral and therefore nonviolative of Batson.
 III
The appellant next alleges that prosecutorial misconduct denied him a fair trial. First, the appellant contends that he was denied a fair trial because, he says, the prosecution failed to timely disclose information. The record reflects that the Friday before trial was set to begin on Monday, defense counsel filed a motion for discovery of files necessary for him to obtain a fair trial. The *Page 499 
court on the same day ordered that the state provide the court with its entire files. The record further reflects that the trial court went through the record and disclosed to the appellant information it deemed to be exculpatory. The court stated the following:
 "There is absolutely without a doubt nothing that would prejudice the Defendant in these files by not granting a continuance, the Court not granting a continuance in this matter. All of these exculpatory and/or impeaching statements were made by co-defendants. And the Defense has been provided a copy of all of the co-defendant's statements."
The appellant, relying on Ex parte Monk, 557 So.2d 832
(Ala. 1989), contends that he was entitled to all of the discovery he requested in his motion. In Monk the Alabama Supreme Court stated:
 "[T]he question before us here is whether capital cases by their very nature are sufficiently different from other cases to justify the exercise of judicial authority to order discovery from the prosecution as broad as that contained in Judge Monk's order of April 10, 1989 [which provided for open file discovery]. We hold that capital cases are sufficiently different by their very nature, and that the discovery order of April 10, 1989, in these two capital cases was within the discretionary authority of the trial court.
 "The capital case is 'sufficiently different' from other cases, because there is no other criminal case in which the crime is murder and the possible punishment is death or life imprisonment without parole. See: § 13A-5-39 et seq. Justice Brennan explained how the Justices of the United States Supreme Court view capital cases, as follows: 'When the penalty is death, we, like state court judges, are tempted to strain the evidence and even, in close cases, the law in order to give a doubtfully condemned man another chance.' Furman v. Georgia, 408 U.S. 238, 287 [92 S.Ct. 2726, 2750-51, 33 L.Ed.2d 346] (1972). The hovering death penalty is the special circumstance justifying broader discovery in capital cases.
 "In addition, because of the nature of the penalty in a capital case, the sentencing process becomes of utmost importance. For this reason our Alabama statutes provide in a capital case for a 'separate sentence hearing to determine whether the defendant shall be sentenced to life imprisonment without parole or to death.' § 13A-5-45. At this hearing, under existing constitutional and statutory law, a convicted capital defendant has the right to introduce and have considered at the sentence hearing, by way of mitigation, evidence that reflects upon his life, his character, and the circumstances of the crime. § 13A-5-45; § 13A-5-51; § 13A-5-52. See, Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978); Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987); Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)."
557 So.2d at 836-37.
The Alabama Supreme Court in Monk established an extensive right to discovery in capital cases because of the fact that "any evidence" may be relevant to mitigating a sentence of death. Here, the appellant was not sentenced to death. Further, the appellant did get all of the information he sought. The appellant has not stated in brief what evidence that was untimely disclosed resulted in his being prejudiced. No error occurred here.
The appellant further contends that he was prejudiced because one state witness would not speak with him, because one prospective witness was not called by the state, and because the police lost a taperecording of one witness's statement.
The witness who refused to talk with defense counsel testified that he saw the shooting and that the shots were fired from the backseat of a yellow Cadillac. This testimony was cumulative of the testimony of many other witnesses.
The prospective witness who was not called by the state was allegedly going to testify that the victim was driving erratically before he was shot. The record reflects that there was no dispute that the victim was *Page 500 
intoxicated when he was shot and killed. Dr. Paredes testified that the victim had both alcohol and cocaine in his system at the time of death. Further, defense counsel could have called this witness if the defense believed that her testimony would be helpful to the defense.
As to the tape-recording of the witness's statement being lost by police, the appellant has failed to prove the culpability of the police or that the contents of the recording would have been material to his defense. Gurley v. State,639 So.2d 557 (Ala.Cr.App. 1993).
The appellant further contends that the prosecution prejudiced him by introducing into evidence a copy of the Alcohol, Tobacco and Firearms (A.T.F.) transaction record form completed when Henderson bought the assault rifle. The appellant contends that the form contained irregularities.
The record reflects that the clerk at the pawnshop where Henderson bought the assault rifle testified that he sold the rifle to Henderson. He further testified that he completed an A.T.F. form in his presence and that he charged the purchase of the rifle to a credit card. The A.T.F. form and the credit card receipt were received into evidence. The form was cumulative of the evidence testified to by the clerk as evidenced by the credit card receipt. These items were received into evidence to support the clerk's testimony that Henderson purchased the rifle. No error occurred here.
For the foregoing reasons, the judgment in this cause is due to be, and is hereby, affirmed.
AFFIRMED.
All the Judges concur.