THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee v.
WILLIAM HERNANDEZ, Defendant-Appellant.
First District (1st Division)   No. 1—87—2748

Opinion filed September 30, 1991.

Michael J. Pelletier and Janice Lynn Triptow, both of State Appellate
Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb and Jane
E. Loeb, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MANNING delivered the opinion of the
court:

The defendant, William Hernandez, along with codefendant Anto-
nio Silva, was charged by indictment with murder, attempted murder,

armed violence, and aggravated battery. Silva entered pleas of guilty to murder and attempted murder for which he was sentenced to 20 years' imprisonment. He is not a party to this appeal. Following a jury trial, Hernandez was convicted of all charges and was sentenced to 40 years' imprisonment for murder to be served consecutively with two 30-year concurrent sentences imposed on each attempted murder count. On appeal defendant argues that the trial court: (1) improperly denied his motion to suppress statements; (2) erred in barring a third party's confession into evidence; (3) committed reversible error in its jury instructions on attempted murder; (4) erred in allowing the prosecutor to make inflammatory comments; (5) erred by refusing to allow him to question a prospective juror about her race; and (6) abused its discretion in sentencing him to 70 years' imprisonment. The pertinent facts relevant to our disposition of this case are set forth below.

On September 22, 1985, around midnight, defendant Hernandez, then 16 years of age, Sal Esquivel, Pablo Alvarez, Frank Herrera, Ralph Tamez and other Two-Two Boys gang members, as they were walking home from a party, were approached by a rival gang member who pulled out a gun and shot and wounded Sal Esquivel in the back. At approximately 2:45 a.m., three members of that gang, the Latin Kings, were shot, resulting in the death of Rogelio Valdez and permanent injuries to Adrian Guerrero and James Lilly. The next day defendant Hernandez and Antonio Silva were charged in the second incident wherein the three Latin Kings were shot. Prior to trial, defendant moved to quash his arrest and suppress evidence contending that the police lacked probable cause to arrest him. He also moved to suppress his statements, alleging they were involuntary and that his rights under the Juvenile Court Act (Ill. Rev. Stat. 1985, ch. 37, par. 703—2(2)) were violated because neither his parent nor legal guardian was notified nor was he turned over to a juvenile officer.

The court held separate hearings on the motion to quash arrest and suppress evidence and the motion to suppress statements. Detective Miller testified at the hearing on the motion to quash arrest that on September 22, 1985, he and his partners, Detectives Jim Hanrahan and Ben Wieclawek, were assigned to investigate a shooting that occurred about 2:45 a.m. in which Rogelio Valdez was murdered and Adrian Guerrero and James Lilly were wounded. While conducting his investigation, Detective Miller learned that a related shooting had occurred about 12 a.m. that morning involving a victim named Sal Esquivel. Miller stated that Detective Thomas O'Connor was assigned to investigate that shooting.

Miller testified that he read a report prepared by Detective O'Connor regarding the Sal Esquivel shooting and that the report gave the names and addresses of witnesses to the shooting. The report also gave a description of the clothing and physical features of the assailants. Miller stated that the defendant was listed in that police report as a witness and that he was advised that defendant and a second witness to the Esquivel shooting wore clothing similar to that described in the report, to wit: tan pants and a dark, hooded sweater. Miller testified that he was also informed that the defendant had discussed possible retaliatory action against the shooter of Sal Esquivel while at the hospital. Detective Miller further testified that he reviewed the police report prepared in the Rogelio Valdez shooting. In that report the offender was described as a white Hispanic male, 18 to 19 years old, 5 feet 8 inches, 140 pounds, wearing tan pants and a black-hooded sweatsuit.

Miller testified that about 1 p.m. that afternoon, he talked with Ralph Tamez, then went to the home of Carlos Hernandez, defendant's uncle. Miller stated that Hernandez did not know defendant's whereabouts and told him "if you find him, he's yours."

Detective Miller testified that about 3 p.m., on September 22, 1985, he and his partner picked defendant up at Marshall Boulevard and 23rd Street. They told defendant that they wanted to question him about both shootings which had occurred the previous evening. Defendant agreed to go voluntarily. The officers did not tell him that he was a suspect in the murder. Defendant was not immediately advised of his *Miranda* rights, and he was left alone in an interview room that may have been locked. About one hour later, Officers James Hanrahan and Dan Wieclawek questioned defendant for approximately 15 minutes about the shootings. Miller testified that defendant was arrested at 5 p.m., at which time he was advised of his *Miranda* rights. Miller ended his shift at 7 p.m., and defendant remained in the interview room when he left.

Hanrahan testified at the hearing on the motion to quash arrest and suppress evidence that at about 2:45 a.m. on September 22, 1985, he was assigned to investigate a fatal shooting. Hanrahan stated that he, accompanied by Detective Miller and a Hispanic male, drove to Marshall Boulevard and 23rd Street, the area in which the shooting occurred. Hanrahan saw the defendant, Frank Herrera and Pablo Alvarez standing on the corner. Officers Hanrahan and Miller exited the car, approached the three, then Detective Miller asked defendant to accompany them to the station.

Hanrahan testified that at the station defendant was placed in a second-floor interview room but was not handcuffed at that time. Hanrahan stated that he and Officer Wieclawek talked with defendant for about 15 minutes and that they did not strike the defendant.

Hanrahan further testified that at approximately 6:30 p.m. on September 23, 1985, defendant was placed in a lineup for 10 minutes. Hanrahan stated that neither he nor Officer Wieclawek struck the defendant.

Defendant testified that on September 22, 1985, he and Frank Herrera were standing on the corner of 23rd and Marshall Boulevard when an unmarked police car drove up. He stated that the officer driving the car asked him his name and asked if he would ride to the police station to view a lineup of suspects in the Sal Esquivel shooting. Defendant stated that he voluntarily accompanied the officers to the station. However, upon arrival at the station, defendant was placed alone in a small room behind locked doors and, despite his constant banging on the door, the officers did not return for seven to eight hours. Defendant testified that he never viewed a lineup and was later questioned about the Valdez murder. Defendant told the officers that he had been at his uncle's apartment, as well as with his mother. Defendant testified that the officers never advised him of his *Miranda* rights.

The following day defendant was placed in a lineup with other Hispanic males. Neither of the two witnesses identified him as the assailant. Defendant stated that he attempted to speak to one of the participants, but Detective Miller grabbed him by the throat, threw him against the wall and kneed him in the groin. On September 23, 1985, at approximately 10 p.m., about 30 hours after his arrest, defendant made an oral inculpatory statement. Subsequently, he gave a statement to the assistant State's Attorney which was recorded by a court reporter and signed by defendant after transcription. Following the presentation of evidence, defendant's motion to quash arrest and suppress evidence was denied.

Next, a hearing was held on the motion to suppress statements. The following evidence was adduced.

Three of the lineup participants testified that Miller physically abused defendant while he was in the lineup. Daniel Sanchez testified that he was a lineup participant with defendant on September 23, 1985. He stated that while in the lineup, Officer Miller grabbed defendant by the throat, threw him against the wall and hit defendant in his groin area. Eddie Perez corroborated Sanchez's testimony. Robert Gambots, a third participant in the lineup, testified that the

defendant attempted to talk with him while they stood in the lineup when Officer Miller grabbed defendant by the throat, pushed his head against the wall then kicked him in the groin area with his knee.

There was a stipulation between the parties that Frank Herrera would also testify that Miller, in fact, did physically abuse defendant. Miller claimed that he never entered the room while the lineup was in progress, and he denied ever choking defendant or kneeing him in the groin. Miller stated that he did not contact defendant's mother or uncle after defendant was arrested, but explained that he did contact a juvenile officer who was present at the time defendant confessed. Miller explained that he had previously contacted defendant's uncle and the uncle advised him that if he found defendant "he's yours." The uncle denied making this statement.

Carmen Johnson, defendant's mother, testified that in September 1985, she was not advised that defendant had been arrested and taken into custody until three days after his arrest. She explained that defendant was the oldest of her three children and had lived with her brother the past two years. At the conclusion of the evidence, the court denied the motion to suppress statements.

At trial, Officer Miller's testimony was substantially similar to his testimony on the pretrial motions. The testimony of Detectives Hanrahan and Wieclawek substantially corroborated Detective Miller's testimony. Detective Hanrahan testified that he was the only officer stationed in the interview room with the seven participants in the lineup. He stated that the lineup lasted about 15 minutes and that he did not leave the room until he was informed that the lineup was completed. At that point, he may have left briefly to determine the outcome of the lineup, but the participants remained alone in the room. Hanrahan stated that he never raised his knee into defendant's groin, nor grabbed him by the neck or struck him.

Hanrahan also testified that there was a two-way mirror separating the participants from the victims and that Detective Miller may have been in the opposite room with the victims during the lineup, but that he never entered the room with the participants. Hanrahan stated that defendant never told him that he had been struck by Detective Miller.

Officer Louis Caesar testified that on September 21, 1985, he went to Mt. Sinai Hospital, where Sal Esquivel was taken, and there talked with defendant. Defendant told Officer Caesar that he was a member of the Two-Two Boys Gang and that the victim was shot by a rival gang member. Officer Caesar stated that he asked defendant if he wanted to tour the area where the shooting had occurred to look

for the assailant and defendant replied, "[F]uck it, I will handle it myself."

Frank Herrera and Ralph Tamez, also Two-Two Boys Gang members, were at the hospital on the day the victim was shot. Herrera testified that while at the hospital defendant told him that he wanted "to pull a hit" and that he wanted to get some guns. Herrera and other gang members left the hospital, drove to Cornell Park, then drove to 63rd Street and Western Avenue where they assembled with other gangs. Herrera stated that as they drove, defendant again stated that he wanted to pull a hit and get some guns. He testified that defendant also told Tamez that he wanted to pull a hit because "my boy got shot." Herrera drove to 23rd Street and Oakley Avenue and defendant exited while Herrera remained inside the car. About 20 minutes later defendant returned, made hand gestures of a gun and told Herrera "I got one but I don't know about the others."

Defense counsel attempted to elicit testimony from Ralph Tamez regarding an alleged statement that Pablo Alvarez made to him. The State objected to this attempted testimony, but the court allowed defense counsel to make an offer of proof. Defense counsel made an offer of proof that Ralph Tamez would testify that five weeks after the shooting, Pablo Alvarez admitted to Ralph Tamez that Pablo Alvarez shot the individuals that defendant was accused of shooting. The State had been given a statement to this effect signed by Ralph Tamez, but not Pablo Alvarez, who was not available at trial. After hearing the offer of proof, the court sustained the State's objection.

Assistant State's Attorney Michael Kelly testified that about 1:45 a.m. on September 24, 1985, in the presence of himself, Officer Wieclawek, Assistant State's Attorney Gerber and a youth officer, defendant gave a statement explaining the shooting. Defendant stated that on the day of the incident he and other members of the Two-Two Boys Gang were walking home from a party when members of a rival gang approached them and began shooting, striking Sal Esquivel, a Two-Two Boys Gang member, in the back. Defendant described how he later returned to Cornell Park, fired several shots into a crowd, then threw the gun away and fled. Defendant stated that while in custody he was given water, coffee, food and was allowed to use the washroom. Defendant further stated that no promises or threats were made and that he gave the statement because he was tired of lying.

Adrian Guerrero, James Lilly, Robert Romo, Rene Martinez and Hector Duminquez each gave accounts of the shooting. Guerrero described the shooter as a Hispanic male, 5 feet 11 inches tall, weighing 140 pounds. The shooter wore dark pants and a black-hooded sweat-

suit. They testified that on their way to a party, they were approached by two males, who first asked whether they were "Kings," then fired several shots which hit three of the men. Five spent cartridges were found but no gun was recovered from the crime scene. James Lilly identified defendant as the shooter from an array of photographs and also identified him in court.

Dr. Barry Lifschwultz, a forensic expert, testified that the decedent's death was caused by an injury to a major blood vessel from a gunshot wound to the right shoulder.

During closing argument the prosecutor compared defendant to Al Capone and repeatedly made general comments about gang problems in the city.

Defendant has raised a *Batson* issue, and we shall proceed with that issue before addressing the others raised.

During *voir dire* by the court of prospective juror Sol Ayala, the assistant State's Attorney exercised his right to peremptory challenge and excused Ayala. Defense counsel objected and the following colloquy occurred:

"MR. CALABRESE [Assistant State's Attorney]: Your Honor, with thanks the People would excuse Leslie Jacobs and Sol Ayala.

THE COURT: Leslie Jacobs and Sol Ayala is [*sic*] excused.

MR. GREEN [defense attorney]: Excuse me, your Honor, may I ask for a sidebar, please.

THE COURT: Surely.

\* \* \*

THE COURT: What is it[?]

MR. GREEN: Your Honor, I object to the State's use of a peremptory challenge against Ms. Sol Ayala. I believe under the recent supreme court case of Batson versus Kentucky we have a right to object to the use of the peremptory challenge.

I believe that the record should reflect that Ms. Sol Ayala is a member of apparently a Hispanic minority group.

\* \* \*

THE COURT: I don't know whether either of them are [*sic*] Spanish. What you are saying is that their names seem to be.

MR. GREEN: Yes, your Honor, they appear to be Hispanic certainly. If the Court wishes to make the record clear that is why I asked that Ms. Ayala remain.

THE COURT: Make the record clear as to what[?]

MR. GREEN: Minority status, if any.

THE COURT: I can't tell from looking at her.

What does the State got [*sic*] to say[?]

MR. CALABRESE: Judge, I think that counsel has a burden to demonstrate some kind of an effort on the part of the State to prevent people from his defendant's minority from being on the jury. He has made no showing that the State is intentionally doing that. There were two as I understand it, two female white Hispanics or potentially two female white Hispanics.

THE COURT: You mean with Hispanic names. I don't know whether they are Hispanic.

MR. CALABRESE: Yes. We kept Ms. Cynthia Villarreal. If she is Hispanic we certainly kept her.

THE COURT: Well, both sides accepted her. When you say 'we kept her' I don't know what that means. She was accepted by both sides.

MR. CALABRESE: I don't think that counsel has met his initial burden.

THE COURT: Well, I don't think so either.

MR. GREEN: May I respond very briefly.

THE COURT: To what?

MR. GREEN: To the overruling of our objection.

THE COURT: Well, I overrule your objection, yes, I don't know whether this lady is Hispanic or not.

Is there anything else?

MR. GREEN: Your Honor, if I remember Batson correctly we only have to show the exclusion of an individual who is of the same [cognizable] group as the defendant. At that point the burden shifts to the State. We have no burden to prove an intentional exclusion. We have no peremptory to prove, based on race or any other factor.

Once it occurs, and I wish I had Batson with me there is a quotation with it—

THE COURT: I am familiar with it, yes.

MR. GREEN: Which says that the appearance itself where it may occur—can't remember the language I will not take a chance on misquoting it.

I do believe, however, that Batson says that once it occurs, once that excluded juror is a member of the same [cognizable] group that the burden then shifts with the State.

MR. GREEN [*sic*]: Right and you have not established that it is a person of the same [cognizable] group.

Let's proceed with the trial.

MR. GREEN: I would ask that Ms. Ayala be called in to make clear.

THE COURT: Counsel, it is your obligation to do so and I find that you have not done so.

Let us proceed with the selection of the jury. I have overruled your objection.

MR. GREEN: I would ask for an opportunity to have Ms. Ayala called in and questioned.

THE COURT: Counsel, I've overruled your objection. Let's proceed with the selection."

■■ Reviewing the above testimony, it is clear that the court was confused as to the procedure necessary to establish a *prima facie* case of purposeful discrimination under *Batson.* Pursuant to *Batson,* to establish a *prima facie* case of race discrimination, the defendant must prove three elements: (1) defendant is a member of a cognizable racial group; (2) the State exercised its peremptory challenges to remove members of that cognizable racial group from the venire; and (3) other relevant circumstances raise an inference that the State used peremptory challenges to exclude minority venirepersons. *Batson v. Kentucky* (1986), 476 U.S. 79, 96, 90 L. Ed. 2d 69, 87, 106 S. Ct. 1712, 1723.

Recently, the United States Supreme Court relaxed the *prima facie* requirements of the *Batson* test and held that racial identity between the defendant and the excluded juror is not necessary to establish a *prima facie* case of race discrimination. (*Powers v. Ohio* (1991), 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364.) As a result, in order to prove a *prima facie* case of race discrimination in the State's use of peremptory challenges, defendant must now prove relevant circumstances (which may include racial identity between the defendant and the excluded venireperson) which raise an inference that the State used its peremptory challenges to exclude members of the venire for race-based reasons. The *Powers* court specifically noted that its decision is not inconsistent with *Batson.* Racial identity between the defendant and the excluded venireperson remains a factor in that, when present, it is a relevant circumstance to be considered by the court.

In the instant case, defense counsel immediately challenged the State's use of a peremptory challenge to exclude Sol Ayala. He explained to the court that he believed that the excluded juror was Hispanic and desired to establish that fact for the record. The State replied that defense counsel had the burden of showing that the State made an intentional effort to prevent people of defendant's minority

from being selected for the jury, then explained that one of two female white Hispanics, or potentially Hispanic, was selected for the jury. The State concluded that it did not believe that defense counsel had met his initial burden. The trial court agreed with the State and overruled defense counsel's objection.

■■ The first part of the *Batson* test mandates that defendant establish a *prima facie* case of racial discrimination. (*Batson*, 476 U.S. at 93, 90 L. Ed. 2d at 85, 106 S. Ct. at 1721.) Once the court finds that such a case has been established, the burden shifts to the State to provide a race-neutral explanation for each peremptory challenge to which defendant objected. *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.

■■ The facts in the instant case are unique. Defense counsel argues that he was deprived of the opportunity to establish his *prima facie* case. Because of the manner in which the colloquy took place, it is simply not ascertainable from the record whether the defendant was denied that opportunity. Although *Powers* relaxed the requirement that defendant and the excluded juror share the same race, that decision clearly stated that it was not inconsistent with *Batson*. Thus, the race of the excluded juror may still be a factor in determining whether the defendant has established a *prima facie* case. The court's denial of affording defense counsel the opportunity to question the juror about her race, when the court itself admitted that it was not certain of her race, was error.

We, therefore, remand the cause to the trial court for a *Batson* hearing and retain jurisdiction to review the trial court's decision following that hearing, and for consideration of the other issues raised in this appeal, but not decided. *People v. Jones* (1988), 177 Ill. App. 3d 663, 532 N.E.2d 543.

Accordingly, the decision of the circuit court of Cook County is remanded.

Remanded.

BUCKLEY and O'CONNOR, JJ., concur.