# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 12, 2011 Session

## STATE OF TENNESSEE v. STEVEN VAN TUCKER

**Direct Appeal from the Circuit Court for Lauderdale County**
**No. 8716      Joseph Walker, III, Judge**

**No. W2010-01943-CCA-R3-CD  - Filed April 25, 2012**

Defendant, Steven Van Tucker, was convicted of the indicted charge of theft of property valued greater than one thousand dollars and less than ten thousand dollars, a Class D felony. Defendant was sentenced by the trial court to twelve years as a career offender. On appeal, Defendant asserts that 1) the trial court erred in denying Defendant's objections to the State's challenges of three African-American jurors under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986); 2) the evidence at trial was insufficient to support Defendant's conviction; 3) the trial court erred in admitting Defendant's prior convictions for impeachment purposes; and 4) the trial court improperly denied Defendant's request to be sentenced to Community Corrections. After a careful review of the entire record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, PJ., and NORMA MCGEE OGLE, J., joined.

Vanedda Prince Webb, Dyersburg, Tennessee, for the appellant, Steven Van Tucker.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; C. Phillip Bivens, District Attorney General; and Julie Pillow, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

*Trial*

Mark Crook, of the Ripley Police Department, investigated the burglary of a residence located at 322 Highland Extended. When he arrived at the residence, he observed a realtor

sign in the yard, and it appeared that no one was living in the house. The window in the door leading from the carport into the house was broken, and there was glass on the step. The door was unlocked. Investigator Crook and Lieutenant Jordan entered the house. Investigator Crook contacted the utility company to determine the owner of the house. The owner of the house was Eddie Lou Kelley, but Ms. Kelley did not live there at that time. He then contacted Sandra Davis, Ms. Kelley's daughter, and asked her to meet him at the residence. When Investigator Crook entered the residence, he noticed several indentations in the carpet where furniture had previously been located and was then removed. Ms. Davis provided him with a list of missing property. Investigator Crook then contacted two local businesses that bought and sold used furniture. He went to Furniture Unlimited and spoke to the owner, Joseph Rose. He then called Ms. Davis, who went to the store and identified an antique cherry dining room set as belonging to her mother. Mr. Rose gave Investigator Cook a carbon copy of the check he wrote to purchase the furniture. The check was made to Defendant in the amount of $60 and had "table and chairs" written on the memo line. Mr. Rose described the vehicle in which Defendant brought the furniture to the store as a black Chevy Avalanche, and he stated to Investigator Crook that there were two females with him.

Investigator Crook ascertained Defendant's address and had a warrant issued for Defendant's arrest. He went to the apartment where Defendant lived with Aisha Jones, Defendant's co-defendant, and spoke to the landlord, Raymond Proctor. Ms. Jones arrived and gave her consent for Investigator Crook to search the apartment. When Investigator Crook entered the apartment, he observed "a house full of furniture that fit the description of the furniture that Ms. Davis had given [him]." He photographed the furniture and confirmed with Ms. Davis that the furniture belonged to her mother. Investigator Crook testified that he and other officers used a six feet by ten feet enclosed trailer to move the furniture and that the trailer was "completely full" of furniture. In a "question and answer" statement that Ms. Jones gave to Investigator Crook, she stated that Defendant had brought two dressers, a bed, a china cabinet, a headboard, and costume jewelry into their apartment on Sunday. She stated that Defendant had already sold two end tables and a kitchen table and chairs. She, her mother, and Defendant had gone to a furniture store to sell them. Investigator Crook did not recover the end tables or the china that Ms. Davis stated had been in the china cabinet.

During his investigation, Investigator Crook took the following statement from Defendant:

> This guy sold me this furniture for $100 Saturday sometime around evening. This guy like, he about 30 something. I don't know him. But I didn't break into any house. My girlfriend don't know anything about this matter. This Saturday. I also have my family for witnesses.

Joseph Rose testified that he owned Furniture Unlimited. In July, 2009, he purchased an antique cherry dining room set from Defendant. Defendant also brought in a marble plant stand that was "just tore up so bad," Mr. Rose threw it away. Mr. Rose paid Defendant for the furniture with a check in the amount of $60.00. Defendant told Mr. Rose that he was selling the furniture because "he was moving out of town, getting out of Ripley, wasn't nothing going on."

Sandra Davis, the victim's daughter, testified that her mother, Eddie Lou Kelley, was the owner of the residence at 322 Highland Extended, but that Ms. Kelley was residing in an assisted living residence at the time of the burglary. By the time of trial, Ms. Kelley had passed away and Ms. Davis was a joint executor of her estate. Ms. Davis testified that in July, 2009, she was contacted by the Ripley Police Department and advised that her mother's house had been burglarized. Ms. Davis testified that several pieces of furniture and other items of personal property were missing from the house, including the dining room furniture, bedroom furniture, and the contents of the furniture, including clothing, jewelry, paperwork, and "keepsakes that she had from when she was in high school and made different kind of books and stuff. And she had letters from [Ms. Davis'] daddy that was during World War II." Ms. Davis recovered "a few gloves and a couple of scarves" and two jewelry boxes. She estimated the value of the bedroom furniture to be five thousand dollars and the value of the dining room furniture to be two thousand dollars. There were also two sets of china, which Ms. Davis estimated the value to be two hundred dollars per set, that were not recovered. In the administration of Ms. Kelley's estate, the fair market value of the bedroom furniture was set at $4,980, and the value of the dining room set at $1,980. Ms. Davis testified that she estimated the value of the furniture based on her belief that it was Lillian Russell furniture; however, she acknowledged on cross-examination that if the furniture was not Lillian Russell, it would be worth less money. Ms. Davis did not give consent to anyone to remove the furniture from her mother's house.

Elaine Tucker, Defendant's sister, testified that sometime in July, 2009, while at her house, Defendant purchased furniture from someone. Ms. Tucker "heard the truck pull up and [she] went to the door and looked out, and [she saw] the truck out there, and he had some what looked like furniture on the truck." Ms. Tucker testified that it was a red truck, and she did not know the man driving it. Defendant was outside. Defendant went inside and asked Ms. Tucker for twenty dollars to help purchase the furniture, and Ms. Tucker gave him twenty dollars. Ms. Tucker testified that Defendant lived with her at the time and that he went over to Ms. Jones' apartment "occasionally." Ms. Tucker could not describe the person who sold Defendant the furniture, or describe the furniture because she only "glimpsed outside." Ms. Tucker testified that this happened at approximately 5:00 p.m.

Constable Mickey Tucker testified that Defendant was her stepson. She testified that she was sitting in her wheelchair on Elaine Tucker's front porch when she saw Defendant buy furniture from someone driving a red truck. She saw a mattress and headboard on the back of the truck. She described the headboard as "dark brown," and it had bed posts. Defendant asked to borrow thirty dollars from Ms. Tucker, which she loaned to him. Defendant also borrowed money from his mother and sister. Ms. Tucker testified that this happened at approximately 12:00 or 12:30 p.m., and Defendant left with the man. Ms. Tucker did not know where Defendant took the furniture. She testified that Defendant was living with Aisha Jones' mother at that time.

Pamela James testified that she dated Defendant's brother Alfred. She testified that she and Alfred were living with Elaine Tucker during the summer of 2009. She testified that she saw Defendant buy furniture from someone at Ms. Tucker's house. She heard a truck "with loud noise" and looked out the window. She testified that she did not know what the truck looked like or "even . . . whether it was furniture or not." She testified that she saw "some stuff piled on the back of the truck." She "didn't pay no [sic] attention because [she] was watching a TV show, and [she] just glanced." Ms. James testified that Defendant was living at his sister's house at that time and that Ms. Jones lived with her mother. She testified that this happened sometime in the evening.

Ed Daniels, Jr. testified that he was a personal property appraiser with "about 40 years' experience." Mr. Daniels testified that he obtained certification from the National Auctioneers Association in 2002 after he completed a five-day course on personal property appraisal. Mr. Daniels had appraised Davis Cabinet Company, and specifically Lillian Russell furniture, on two prior occasions. Mr. Daniel was qualified as an expert by the trial court. Mr. Daniels examined the furniture in this case and testified:

> Every piece of the bedroom furniture had a four-digit serial number or stock number on it which should have identified that piece of property as to what it was. It also had stamped on the back of it "Collector's cherry" on it.

> The only problem with the numbers on it is, on the dresser base the stock number of 2327 was stamped on it with "Collector's cherry." If you look up a Lillian Russell piece 2327, that comes out to be an entertainment center, not a dresser.

> . . . .

> Lillian Russell or the Davis Cabinet Company has used several different markings over the years. Some are metal that say "Lillian Russell" or

"Davis Cabinet Company, Nashville, Tennessee." They will be a bronze. They will be a silver. There is [sic] also some cloth labels that are stuck to or in the dressers of the furniture that identify Lillian Russell furniture by the Davis Cabinet Company.

Mr. Davis testified that it was his opinion that the furniture in this case was not Lillian Russell furniture but that it was "a really good reproduction." Mr. Davis estimated the value of the bedroom furniture to be between $150 and $350. Mr. Davis testified that the dining room furniture was also a good reproduction and estimated its value to be "anywhere from $125 to $175 [at a yard sale], and $250 to $350 in a consignment store."

Defendant did not testify at trial.

*Sentencing Hearing*

At the sentencing hearing, Sandra Davis testified that some of the property taken from her mother's house was recovered and some was not. She declined to ask for restitution for herself or her mother's estate but asked the court to consider ordering restitution for Mr. Rose for the furniture he bought from Defendant that was later recovered by investigators.

Aisha Jones testified that this was her first conviction and requested that the court sentence her to probation because she had "never just been involved with drugs, guns, or nothing like that." Regarding Defendant, Ms. Jones testified that she believed he would benefit from long-term substance abuse treatment. She testified, "Yes, he needs it bad, because his problem wasn't – it was getting better, and then I thought he was going to change in the process. So, yes, he need it."

Defendant testified that he needed treatment for substance abuse. Defendant testified:

Well, all the times I've been coming to this courtroom it's not out of doing drugs and alcohol. And I know if I was into a rehabilitation center for long-term it would help me get the tools that I need to help, help me rebuild myself, have a new foundation.

And I done got tired. I got old. And I'm learning from this. Like she said, you can't trust everybody. And by me on drugs and alcohol, I failed to believe something that wasn't true. And I know that if I was allowed to get this treatment at this place, at JACOA, that I could be better man. And I know I could be a better man, and I wouldn't make the same choices and

-5-

mistakes I did, coming out of institutions, doing the same things, when I know I can get some treatment and it would stop this, put it to an end.

Defendant testified that he had previously undergone a 28-day rehabilitation program, but he was denied long-term treatment because he did not have insurance for it. Defendant requested that the court sentence him to Community Corrections and order him to complete a long-term substance abuse treatment program. He testified that he would comply with the conditions imposed. Defendant acknowledged that the victim's family was hurt by his actions and accepted "[his] part" in that.

The trial court considered the presentence report and the two victim impact statements entered into evidence. The trial court also admitted into evidence a letter from two staff members of the Lauderdale County Justice Complex, recommending that Defendant be sentenced to a long-term rehabilitation program.

At the conclusion of the sentencing hearing the trial court found Defendant to be a career offender and sentenced Defendant to serve twelve years in confinement. The court ordered his sentence to be served consecutively to a sentence for which Defendant was on parole at the time of the offense. The court recommended drug treatment through the Tennessee Department of Correction and denied alternative sentencing.

*Analysis*

I.    *Batson* Challenges

Defendant asserts that the trial court improperly excluded three African-American jurors solely on the basis of race in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986). In *Batson*, the United States Supreme Court held that a state's use of peremptory challenges to intentionally exclude potential jurors of the defendant's race violates the defendant's right to equal protection. *Id*. at 89; 106 S. Ct. at 1719. "A criminal defendant may object to a race-based exclusion of a juror, effected through peremptory challenges, regardless of whether the defendant and the excluded juror share the same race." *State v. Carroll*, 34 S.W.3d 317, 319 (Tenn. Crim. App. 2000) (citing *Powers v. Ohio*, 499 U.S. 400, 415-16, 111 S. Ct. 1364, 1373-74 (1991).

In *Carroll*, this Court discussed the procedure for invoking a *Batson* challenge as follows:

> *Batson* provides a three step process for the evaluation of racial discrimination claims in jury selection. First the defendant must make a

prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. *Pucket v. Elem*, 514 U.S. 765, 767, 115 S. Ct. 1769, 1770-71, 131 L. Ed. 2d 834 (1995); *Batson*, 476 U.S. at 96-98, 106 S. Ct. 1712, 1722-24. If the defendant satisfies this initial burden, the burden then shifts to the prosecutor to articulate a race-neutral explanation for excluding the venire member in question. *Pucket*, 514 U.S. at 767, 115 S. Ct. 1770-71; *Batson*, 476 U.S. at 94, 106 S. Ct. 1712, 1721. Third, the trial court must determine whether the defendant has met his burden of proving purposeful discrimination. *Batson*, 476 U.S. at 97-98, 106 S. Ct. 1712, 1723-24; *Hernandez v. New York*, 500 U.S. 352, 358-59, 111 S. Ct. 1859, 1865-66, 114 L. Ed. 2d 395 (1991). In making its determination of whether use of a peremptory challenge was discriminatory, the trial court must articulate specific reasons for each of its findings. *Woodson* [*v. Porter Brown Limestone Co., Inc.*], 916 S.W.2d [896,] 906 [Tenn. 1996]. The trial court's findings are imperative for rarely will a trial record alone provide a legitimate basis from which to substitute an appellate court's opinion for that of the trial court. Thus, on appeal, the trial court's finding that the State excused a venire member for race-neutral reasons will not be reversed unless it is clearly erroneous. *See Woodson*, 916 S.W.2d at 906 (citations omitted).

*Carroll*, 34 S.W.3d at 319-20.

In the present case, in the first round of peremptory challenges, the State challenged prospective jurors Traci Pierson and Jacqueline Mongtomery. During voir dire, prospective juror Pierson testified that she went to school with Defendant, but she testified that there was nothing about having gone to school with Defendant that would give her any reservation in the case. Prospective juror Jacqueline Montgomery testified that she knew Defendant and his family and that Defendant had dated her cousin but that nothing about that relationship would give her reservations about the case. Defendant objected to the State's challenges, and the trial court requested the State give its reasons for the challenges. The trial court accepted as race-neutral the State's reasons that Ms. Pierson and Ms. Montgomery had been previously acquainted with Defendant. In the second round, the State exercised a peremptory challenge for juror Pearline Pride, who testified during voir dire that she had known Defendant from "the neighborhood" for "[q]uite a few years" but that she felt she could perform her duties as a juror. As a basis for the State's challenge to prospective juror Pride, the prosecutor stated that Ms. Pride testified she had been Defendant's neighbor for several years. The prosecutor also stated that Ms. Pride's son had been prosecuted and the State "had dealings with her in court with regard to that." In overruling Defendant's objection, the trial court noted "that there is a suspect pattern, but a neutral explanation has been given, in the totality

of the circumstances [the court] finds that the State has a reason for using a peremptory challenge on [juror Pride] other than race based."

Defendant contends that the trial court failed to articulate specific reasons for its findings. As in *Carroll*, the trial court in the case *sub judice* did not make a specific finding that Defendant had made a prima facie showing of discrimination. *See id*. at 392. Nonetheless, the trial court would not have required the State to provide a race-neutral explanation for the challenges had the trial court not found that a prima facie showing had been made. *Id*.; *see also Woodson*, 916 S.W.2d at 905. We assume, therefore, "that the court implicitly found that [Defendant] had satisfied the first prong of the *Batson* test." *Carroll*, 34 S.W.3d at 320. As the United States Supreme Court observed in *Hernandez*, "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez*, 500 U.S. at 359.

The issue in the second step of the Batson process rests upon "the facial validity of the prosecutor's explanation." *Id*. at 360. "A neutral explanation . . . means an explanation based on something other than the race of the juror." *Id*. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id*. A prosecutor's race-neutral explanation must be reasonably clear and specific. *Batson*, 476 U.S. at 98. However, it need not be "persuasive or even plausible." *Puckett*, 514 U.S. at 768, 115 S. Ct. at 1771.

Here, the State gave specific race-neutral explanations, which the trial court accepted, being the prior relationships or acquaintances between each of the prospective jurors and Defendant. We conclude that the prosecutor's reasons for striking the three prospective jurors are sufficient to withstand a *Batson* challenge. Defendant has not shown that the trial court erred in accrediting the State's racially neutral explanations, and Defendant has not shown purposeful discrimination on the part of the State. Defendant is not entitled to relief on this issue.

II.     Sufficiency of the Evidence

Defendant next asserts that the evidence was insufficient to support his conviction for theft of property valued over one thousand dollars. When reviewing the sufficiency of the evidence on appeal, the standard is "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781 (1979). Questions concerning the credibility of the witnesses, the weight and value to

be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, not this Court. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). This Court may not reweigh or reevaluate the evidence but should presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn. 1993).

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103. In *State v. Byrd*, 968 S.W.2d 290 (Tenn. 1998), the Tennessee Supreme Court noted that "theft of property may be accomplished in one of two manners: (1) taking or obtaining property without consent and with an intent to deprive; or (2) exercising control over property without consent and with the intent to deprive." *Id*. at 292.

The evidence sufficiently establishes that Defendant exercised control over Ms. Kelley's property without her consent. Investigator Crook discovered the property in the apartment Defendant shared with Aisha Jones. Mr. Rose testified that he purchased some of the furniture from Defendant. While there was no direct evidence presented that Defendant took possession of the property with knowledge that it was stolen, the jury could reasonably infer from the circumstances that Defendant had knowledge the property was stolen. *See State v. James*, 315 S.W.3d 440 (Tenn. 2010) (possession of recently stolen property, unless satisfactorily explained, creates a permissible inference that the defendant gained possession through theft or had knowledge that the property had been stolen).

Defendant further asserts that the proof was insufficient to establish beyond a reasonable doubt that the value of the property exceeded one thousand dollars. Ms. Davis estimated the value of the dining room set to be two thousand dollars and the bedroom set, five thousand dollars. For the purpose of administering Ms. Kelley's estate, the fair market values of the furniture were set at $1,980 and $4,980 respectively. She estimated the value of the stolen jewelry to be "at least a couple hundred dollars," and the value of the two separate sets of china to be "maybe a couple hundred dollars a set."

Defendant's expert witness, Ed Daniels, Jr., estimated the value of the dining room and bedroom sets to be as high as $350 each at a consignment store. Mr. Daniels did not give an opinion as to the value of the other personal property taken. Even accepting Mr. Daniels' values over Ms. Davis', the proof establishes that the value of the property, taken together, exceeds one thousand dollars. However, the jury could have rejected Mr. Daniels' value and accredited Ms. Davis' testimony. Taken in a light most favorable to the State, the evidence

is sufficient to sustain Defendant's conviction. Defendant is not entitled to relief on this issue.

III.    Prior Convictions

Defendant contends that the trial court erred in admitting as evidence Defendant's prior convictions for impeachment purposes. Prior to trial, the State filed a notice of Defendant's prior convictions for impeachment purposes. Defendant filed two motions in limine to preclude the State from mentioning or alluding to the prior convictions until a hearing could be conducted. At the conclusion of the State's case-in-chief and prior to Defendant presenting his proof, the trial court considered whether evidence of Defendant's prior convictions would be admissible for impeachment purposes:

[DEFENSE COUNSEL]: Your Honor, at some point we would need to make a determination. We filed previously the Motion in Limine regarding [Defendant]'s prior convictions and ask[ed] the Court to make a ruling of whether the Court would find those convictions to be admissible in regard to his credibility.

Of course, Your Honor, it would be our position that the nature of his convictions would be such that the danger of unfair prejudice greatly outweighs any probative value, such that under Rule 403 they should be excluded.

The trial court made the following findings and conclusions:

THE COURT: The State filed a Notice of Convictions for Impeachment Purposes with regard to [Defendant]. The convictions list theft over $1,000 in Lauderdale Circuit Number 7563, burglary and auto theft in 7577. That's auto burglary. I'm sorry. Aggravated burglary in Lauderdale 6925. Aggravated burglary in Lauderdale, the second count. Theft in Madison County, and a forgery in Madison County.

-10-

The Court has looked at the similarity between the crime on trial and the underlying crimes with regard to the theft and finds that the theft convictions would be highly relevant on the issue of credibility, but feels that the similarity of the crimes being identical would outweigh the issue of credibility.

The burglary, auto burglary, and aggravated burglary convictions are dissimilar crimes, all highly relevant to the issue of credibility, and the Court would allow them to be used for impeachment purposes, with the proper warning to the jury that they could consider it only for impeachment purposes.

On appeal, Defendant argues that the prejudicial effect of his prior convictions for burglary, auto burglary, and aggravated burglary outweighed their probative value because although Defendant was only charged with theft in this case, his prior burglary convictions were not "dissimilar crimes" under the facts of this case. Specifically, Defendant points out that even though he was not charged with burglary, the proof clearly showed that Ms. Kelley's home had been burglarized.

This Court reviews a trial court's ruling on the admissibility of prior convictions for impeachment purposes under an abuse of discretion standard. *State v. Lankford*, 298 S.W.3d 176, 180 (Tenn. Crim. App., 2008) (citing *State v. Waller*, 118 S.W.3d 368, 371 (Tenn., 2003). Subject to certain conditions for admissibility, Tennessee Rule of Evidence 609 authorizes the use of proof of a witness's prior convictions in order to attack a witness's credibility. Tenn. R. Evid. 609(a). The prior convictions must be for a felony or for a crime involving dishonesty or false statement. Tenn. R. Evid. 609(a)(2). When the witness to be impeached is the defendant, the State must give notice prior to trial of its intent to utilize the convictions for impeachment purposes. Tenn. R. Evid. 609(a)(3). Upon request, the court must determine the admissibility of an eligible conviction by deciding whether "the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." *Id*. In making this determination, two criteria are especially relevant. *State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999). First, the court must "analyze the relevance the impeaching conviction has to the issue of credibility" and "explain [its relevance] on the record," *id*., and second, the court must "assess the similarity between the crime on trial and the crime underlying the impeaching conviction." *Id*. (quoting Cohen, Sheppeard, Paine, *Tennessee Law of Evidence*, § 609.9 at 376 (3rd ed. 1995)). Recognizing

that the unfairly prejudicial effect of the impeaching conviction on the substantive issues greatly increases if the impeaching conviction is substantially similar to the underlying offense being tried, a trial court should balance its probative value against its unfairly prejudicial effect.

The offenses of burglary and theft are highly probative of credibility. *See State v. Crank*, 721 S.W.2d 264, 266-67 (Tenn. Crim. App. 1986). Courts may admit impeaching convictions when they are particularly probative of credibility, even if they are identical to the crime being tried. *State v. Miller*, 737 S.W.2d 556, 559-60 (Tenn. Crim. App. 1987). "The mere fact a prior conviction of the accused is identical or similar in nature to the offense for which the accused is being tried does not, as a matter of law, bar the use of the conviction to impeach the accused as a witness." *State v. Baker*, 956 S.W.2d 8, 15 (Tenn. Crim. App. 1997) (citations omitted). However, our supreme court has recognized that when the impeaching conviction is the same as the crime for which the accused is being tried the unfair prejudicial effect on the substantive issues greatly increases. *Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999).

In this case, we conclude that the trial court properly considered the necessary criteria and balanced the similarity between the prior convictions and the offense for which Defendant was being tried against the probative value of the prior offenses. The trial court found that, although "highly relevant" to the issue of Defendant's credibility, Defendant's prior convictions for theft were identical to the offense being tried, and the court excluded those prior convictions. The court also acknowledged the similarity of Defendant's prior burglary convictions, but found those to be admissible. The trial court did not abuse its discretion in so finding. Defendant is not entitled to relief on this issue.

IV.    Community Corrections Sentence

Defendant contends that the trial court erred in denying his request for a sentence of Community Corrections and long-term substance abuse treatment.

A sentence under the Community Correction Act is an alternative sentence. *See State v. Taylor*, 744 S.W.2d 919, 920 (Tenn. Crim. App.1987). Thus, this Court must review an issue regarding the Community Correction Act *de novo* pursuant to Tennessee Code Annotated section 40–35–401(d) (2010). Additionally, if the record demonstrates that the trial court properly considered relevant sentencing principles, a presumption of correctness attaches to the trial court's determination. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

The Tennessee Community Correction Act was developed to "punish selected, nonviolent felony offenders in front-end community based alternatives to incarceration, thereby reserving secure confinement facilities for violent felony offenders." Tenn. Code Ann. § 40–36–103(1) (2010). The program is available for:

> (A) [p]ersons who, without this option, would be incarcerated in a correctional institution;
>
> (B) [p]ersons who are convicted of property-related, or drug- or alcohol related felony offenses or other felony offenses not involving crimes against the person . . . ;
>
> (C) [p]ersons who are convicted of nonviolent felony offenses;
>
> (D) [p]ersons who are convicted of felony offenses in which the use or possession of a weapon was not involved;
>
> (E) [p]ersons who do not demonstrate a present or past pattern of behavior indicating violence; [and]
>
> (F) [p]ersons who do not demonstrate a pattern of committing violent offenses . . . .

Tenn. Code Ann. § 40–36–106(a)(1)(A)–(F) (2010).

Those who are sentenced to incarceration or are on escape at the time of sentencing are not eligible for the program. T.C.A. § 40–36–106(a)(2) (2010). These eligibility criteria are "minimum state standards, guiding the determination of eligibility of offenders under this section." Tenn. Code Ann. § 40–36–106(d) (2010). Even though a defendant might meet the minimum eligibility requirements of the Community Correction Act, an offender is not automatically entitled to such relief. *State v. Grandberry*, 803 S.W.2d 706, 707 (Tenn. Crim. App. 1990); *see also State v. Taylor*, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987).

The trial court stated its reasons for denying Defendant's request for a Community Corrections sentence:

> The Court finds it's not a proper case to transfer the sentence to service with alternate sentencing. The defendant has 15 misdemeanor – over 15 misdemeanor convictions of various types, in addition to his felony convictions, and in addition has felony convictions in excess of those

required to have him classified as a career offender. The misdemeanor convictions deal with multiple convictions for theft, there's vandalism, and so forth.

We conclude that the Defendant's extensive history of criminal conduct, past failures at less restrictive measures than incarceration, and previous attempts at rehabilitation followed by continued criminal behavior support the trial court's denial of a Community Corrections sentence. The Defendant is not entitled to relief as to this issue.

## CONCLUSION

The judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE