# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

                  Respondent,

v.

JAKE HUGHES WALKER, JR.,

                  Appellant.

No. 84079-7-I

DIVISION ONE

UNPUBLISHED OPINION

COBURN, J. — Jake Hughes Walker, Jr. was convicted of raping and assaulting his long-term girlfriend, B.E. Walker challenges the trial court's denial of his GR 37 objection to the State's peremptory strike of a Latino juror based on the juror's answer to a voir dire question. Because the State did not exercise a peremptory challenge against a seated "Caucasian"[1] juror who answered similarly, an objective observer could view ethnicity as a factor in the use of the peremptory challenge. Following State v. Tesfasilasye, 200 Wn.2d 345, 355-56, 518 P.3d 193 (2022), we reverse and remand for a new trial.

## FACTS

B.E. and Walker were in a romantic relationship for three years and lived

---

[1] Jurors completed a questionnaire in which they were asked, "What category best describes you?" The categories included, "Caucasian" and "Hispanic, Latino, or Spanish origin."

Citations and pincites are based on the Westlaw online version of the cited material.

together in B.E.'s home in Seattle. On September 13, 2022, the two returned home after attending a family event. During the evening and early morning, B.E. and Walker left the home so Walker could purchase beer and methamphetamine. The two returned home separately. B.E. testified that Walker was agitated and told her they were going to bed.

Once B.E. was in bed, Walker aggressively inserted his hand into her vagina. B.E. told Walker to stop and attempted to squirm away from him because it was painful. B.E. felt Walker place his hand near her vagina and it felt like Walker "pulled down and ripped." B.E. immediately felt severe burning and blood rushing down her legs. She placed a towel between her legs in an attempt to stop the bleeding and laid on the bed in the fetal position. Walker refused to call 911. Walker continued to torment B.E. physically and verbally as she laid in the fetal position. B.E. pleaded with Walker to stop and urged him to lay down in an attempt to calm him.

After Walker laid down, B.E. testified that Walker grabbed her hair and attempted to force his erect penis into her mouth in an attempt to force B.E. to perform oral sex. B.E. resisted, Walker stopped and then strangled B.E. with both hands on her neck, causing B.E. to be unable to breathe for "maybe 30 seconds." Walker left the room and returned holding a butter knife pointed at B.E. B.E. said Walker grabbed B.E. in a headlock and dragged her down the hallway. B.E. eventually managed to get outside and yell for help. Someone driving by stopped and called the police. Police arrived several minutes later and separated Walker from B.E. Medics arrived and transported B.E. to Harborview Medical Center via ambulance.

A gynecologist found severe injury to B.E.'s left labia minora requiring several

stitches. Although B.E. initially declined a "rape kit" exam by a Sexual Assault Nurse Examiner, she ultimately returned to the hospital three days later and consented to the exam. The exam revealed scratches and bruises on B.E.'s arms, legs, back, and buttocks, a cigarette burn on her right leg, and bruising and petechiae consistent with strangling on B.E.'s neck.

Walker was arrested and charged with rape in the second degree (domestic violence) and two counts of assault in the second degree (domestic violence). Walker proceeded to trial in April 2022.

<u>Voir Dire</u>

Jury selection was held by Zoom[2] because of the ongoing COVID-19 pandemic. Voir dire occurred via Zoom, with attorneys asking questions of different panels of potential jurors.

During voir dire, the defense asked jurors whether they thought verbal consent to sexual acts was required. The defense then asked jurors whether they believed, in the context of a long-term intimate relationship or marriage, an "enthusiastic" verbal consent was required before engaging in sexual acts. Juror 37, who identified himself as Latino[3] on his jury questionnaire, first asked the defense attorney to clarify the term "enthusiastic." The defense attorney explained that she meant verbal consent, explaining her question as "do you need to basically ask them, may we engage in this action, and does that response need to be yes?" Juror 37 answered, "Well, I'm going to vote against because you can communicate without language." Juror 40, who identified

---

[2] Zoom is a cloud-based video conferencing software platform.
[3] We follow the lead of both parties and use the term Latino to describe Juror 37 because, except for his response to the questionnaire, nothing in the record establishes a preference as to how Juror 37 wishes to otherwise be identified.

as Caucasian, followed up by saying,

> in some situations, actions might speak louder than words, especially if you're in a long-term relationship or you're married, you might not have to say an enthusiastic yes. I would think it would be more important to – for one of the partners to react to an enthusiastic 'no' or 'stop' as opposed to expecting to hear the word yes.

Juror 37 agreed by stating "Right. Right. Yeah. You can [say] yes or no without using the words." When Juror 40 was asked to again express her thoughts, she said,

> I think that in some situations actions speak louder than words. And you can say yes or no by reacting to what's happening to you. I think it's probably more important if it's something you don't want, to say no or stop as opposed to saying an enthusiastic yes. I think sometimes actions mean yes.

Several other jurors responded to the defense attorney's questions echoing Juror 37's statements that long-term partners or spouses could communicate consent nonverbally.

Juror 47, who identified as Caucasian, said,

> I pretty much agree with what most of the other jurors have said and the fact that consent doesn't always have to be verbal. It can be body language. But consent, it does need to be given . . . Lack of consent would be communicated as well whether that's a verbal or physical denial.

After excusals for hardships, voir dire, and for-cause challenges, the court allowed each party to make eight peremptory challenges. After both parties exercised four peremptory challenges, jurors 37 and 40 were both seated to be in the petit jury.[4] The State exercised its fifth peremptory challenge to excuse Juror 37. The defense objected citing GR 37, noting that Juror 37 was one of few minorities on a largely white panel and that Juror 37 identifies as "Hispanic, Latino, or Spanish origin." The trial court then asked the State to explain its reasoning for the peremptory challenge against Juror 37.

---

[4] A "petit jury" is a "body of persons twelve or less in number in the superior court . . . sworn to try and determine a question of fact." RCW 2.36.010(13).

The State explained that "[m]ostly it was based upon the – Juror No. 37's responses to the issues of consent, his understanding of consent in a marital relationship which I think differed from many people on the panel." The defense attorney asserted that "I think to a disinterested viewer here, I think there's the possibility that race plays a factor in it and a disinterested viewer's analysis of this."

The court overruled the defense objection, stating,

> Well, the analysis the Court engages in, as [the defense attorney] just alluded to is whether a disinterested objective viewer looking at this jury selection process would think that race may be playing in [sic] role in the State's – or any party's exercise of its peremptory challenge.
> I find that the reason articulated by the State does not have any relation to racial characteristics and is not indicative of possible racial animus. So I'm going to overrule the objection and allow the peremptory challenge to Juror 37.

The defense used its fifth peremptory challenge to excuse Juror 32, who was replaced by Juror 47, who also shared the same views as Juror 37 and Juror 40. The State used its three remaining peremptory challenges against jurors other than Juror 47. The final petit jury included jurors 40 and 47. Walker was ultimately convicted on all counts.

Walker now appeals.

## DISCUSSION

Walker argues that the trial court improperly permitted the State's peremptory challenge of a Latino juror despite Walker's objection under GR 37. We agree.

The Washington Supreme Court has applied de novo review of GR 37 objections where "there were no actual findings of fact and none of the trial court's determinations apparently depended on an assessment of credibility." Tesfasilasye, 200 Wn.2d at 356. Such is the case here.

5

Both the state and federal constitutions require trial by an impartial jury. U.S. Const. amend. VI; Wash. Const. art I, § 22. Parties and jurors have the right to a trial process free from discrimination. Powers v. Ohio, 499 U.S. 400, 409, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991). Although not required by the constitution, tradition, statutes, and court rules have created peremptory challenges allowing parties to strike a limited number of otherwise qualified jurors without providing a reason. Tesfasilasye, 200 Wn.2d at 356; RCW 4.44.130, .140; CrR 6.4(e). The use of peremptory challenges is justified because trial attorneys "have instincts about which jurors will be best for their case" and peremptory challenges allow parties "to rely on their instincts and experiences to select a jury that they think will be best for their case." State v. Lahman, 17 Wn. App. 2d 925, 932, 488 P.3d 881 (2021).

Because there is a history of using peremptory strikes as a way to eliminate potential jurors on the basis of racial stereotypes, GR 37 was created to "eliminate the unfair exclusion of potential jurors based on race or ethnicity." GR 37(a); Tesfasilasye, 200 Wn.2d at 357. The goal of the rule was to address the shortcomings of Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), which makes it "difficult for defendants to prove discrimination even where it almost certainly exists" because it requires a trial court to find a purposeful discriminatory purpose without considering systemic or unconscious racial bias. Tesfasilasye, 200 Wn.2d at 357.

Under GR 37(c), a party or court may object to the use of a peremptory challenge to raise the issue of racial or ethnic bias. Upon an objection under this rule, the party seeking to use its peremptory challenge must articulate the reasons that the peremptory challenge was exercised. GR 37(d). The trial court must then evaluate the reasons

given to justify the peremptory challenge in light of the totality of the circumstances. GR 37(e). GR 37(g) outlines a non-exhaustive list of circumstances the trial court should consider, including whether other prospective jurors provided similar answers but were not the subject of a peremptory challenge by that party. GR 37(g)(iii). "If the court determines that an objective observer <u>could</u> view race or ethnicity as a factor in the use of the peremptory challenge, then the peremptory challenge shall be denied." GR 37(e) (emphasis added). The court need not find purposeful discrimination to deny the peremptory challenge. <u>Id.</u> For the purposes of this rule, "an objective observer is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in Washington State." GR 37(f). The remedy for an improper peremptory excusal under GR 37 is to reverse the convictions without prejudice and remand for a new trial. <u>Tesfasilasye</u>, 200 Wn.2d at 362.

Here, during voir dire, the defense posed a question about the expression of consent to sexual acts in a long-term relationship or marriage to the entire voir dire panel, asking if "enthusiastic" verbal consent was always required. In response, Juror 37, a Latino man, responded that he did not agree because couples could "communicate without language." Several other jurors who identified as Caucasian expressed the same opinion as Juror 37. One of them, Juror 40, was seated to be in the petit jury at the time the State exercised its fifth peremptory on Juror 37.

Juror 40, a Caucasian woman, had stated earlier during voir dire

I think in some situations, actions might speak louder than words, especially if you're in a long-term relationship or you're married, you might not have to say an enthusiastic yes. I would think it would be more

7

important to – for one of the partners to react to an enthusiastic 'no' or 'stop' as opposed to expecting to hear the word yes.

Juror 37 agreed with Juror 40 by saying, "Right. Right. Yeah. You can [say] yes or no without using the words." When asked to restate this view, Juror 40 said, "some situations actions speak louder than words. And you can say yes or no by reacting to what's happening to you . . . I think sometimes actions mean yes."

At the time the State had four peremptory challenges remaining, two jurors were seated in the potential petit jury who expressed the same opinion that consent can be expressed through non-verbal communication between partners in a long-term relationship. One was Latino, Juror 37, and the other was Caucasian, Juror 40. The State chose to exercise a peremptory against the Latino juror and not the Caucasian juror.

The circumstance here is analogous to Tesfasilasye, in which the State used a peremptory challenge against a Latino juror based on his answers in voir dire, despite the fact that another juror gave a similar answer and was not peremptorily challenged by the State. 200 Wn.2d at 360-62.

The State urges us to follow State v. Booth, 22 Wn. App. 2d 565, 510 P.3d 1025 (2022), in which this court found that the trial court erred in granting a GR 37 motion, denying the defense's peremptory challenge. At issue was a gross misdemeanor driving under the influence charge and a jury of six. Id. at 568-69; RCW 10.04.050. In Booth, Juror 6, one of two potential jurors of East Asian descent on an otherwise white venire panel, joined four other jurors in agreeing that he was uncomfortable with the idea of drinking and driving and volunteered to defense counsel that he would be in favor of a law completely prohibiting driving after consuming alcohol. 22 Wn. App. 2d at

8

570. The defense attempted to make a peremptory challenge of Juror 6, but the court denied the challenge after the State raised a GR 37 objection. Id. at 570. Juror 6 was empaneled and deliberated. Id. at 571. However, in Booth, of the four jurors who answered similarly to Juror 6, one, Juror 7, was seated and also struck with a peremptory challenge, and the other three were unlikely to be selected for the final jury based on their juror numbers. Id. at 579. This court concluded that because of this strategic use of peremptory challenges, an objective observer could not view race or ethnicity as a factor in the defense's use of the peremptory challenge and held that the trial court erred by denying defense counsel's strike. Id. at 580.

Unlike in Booth, in the instant case, the State did not exercise a peremptory against seated Juror 40 who shared the same opinion as Juror 37. And when another juror who also had expressed the same opinion as Juror 37, Juror 47, was seated, the State still had three remaining peremptories and still did not exercise any of them against Juror 47, who was Caucasian. Both jurors 40 and 47 were empaneled and deliberated. The strategic considerations supporting this court's conclusion in Booth were not present in the instant case.

Also, just as the trial court in Tesfasilasye applied the incorrect analysis, the trial court in the instant case stated that its analysis was "whether a disinterested objective viewer looking at this jury selection process would think that race may be playing [a] role in the State's – or any party's exercise of its peremptory challenge." (Emphasis added.) The trial court denied Walker's GR 37 objection, finding "that the reason articulated by the State does not have any relation to racial characteristics and is not indicative of possible racial animus." The Washington Supreme Court in Tesfasilasye, which was

published six months after Walker's trial, explained that the proper standard is to determine whether an objective observer <u>could</u> view race or ethnicity as a factor in the use of the peremptory challenge, not whether they <u>would</u> view it as such or whether there was a discriminatory purpose behind the challenge. 200 Wn.2d at 357. The court explained that the motive behind the rule is to erase discriminatory effect as well as intent and that the "would view" standard would have required judges to "'endorse 'an accusation of deceit or racism' in order to sustain a challenge to a peremptory strike.'" Id. (internal quotation marks omitted) (quoting PROPOSED NEW GR 37—JURY SELECTION WORKGROUP, FINAL REPORT app. 2 (2018)).

We conclude that an objective observer could view ethnicity as a factor when the State exercised a peremptory challenge against Juror 37, who was Latino, instead of Juror 40, who was Caucasian, when both expressed the same opinion that was the basis for the State's peremptory and both jurors were seated in the potential petit jury.

We reverse and remand for a new trial.[5]

_____
Coburn, J.

WE CONCUR:

_____
Chung, J.

_____
Dwyer, J.

---

[5] Because we reverse, we need not address the remaining issues raised by Walker.